## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

### Epes' Administrator v. Hardaway.

#### January 18, 1923.

1. Witnesses—*Competency—Contract made by Agent—Competency of Other Party to Contract upon the Death of Agent's Principal—Section 6209 of the Code of 1919—Corroboration—Case at Bar.*—The instant case was an action by a broker to recover commissions for the sale of standing timber. The contract was made between an agent of the landowner, acting for his principal, and the broker. The action was brought in the lifetime of the landowner, but upon her death the action was revived and the broker testified as a witness in his own behalf.

   *Held:*  That prior to the Code of 1919 plaintiff was a competent witness and required no corroboration of any kind, and that notwithstanding section 6209 of the Code of 1919, providing that no judgment shall be rendered in favor of an adverse or interested party founded on his uncorroborated testimony where the other party is incapable of testifying, plaintiff still required no corroboration, although in the instant case, if corroboration were necessary, plaintiff was sufficiently corroborated.

2. Witnesses—*Competency—Transactions with Deceased Persons—Purpose and Scope—Section 6209 of the Code of 1919.*—By the Code of 1919, practically all disqualifications of witnesses for interest have been removed. The revisors, however, recognized that in removing such disqualifications, and especially in the case of a survivor of a transaction, there should be some compensating advantages. Hence to meet the difficulties that might arise in consequence of the removal of the disqualifications which had been effected by the repeal of various sections of the then existing statutes, section 6209 of the Code was added. But the corroboration required by section 6209 is applicable only to that class of witnesses who were made competent for the first time by the Code of 1919, and no corroboration is required of those witnesses who were competent before the Code of 1919 became operative, and who did not then require corroboration. The purpose of the revisors was to remove disqualifications, not to create them in any case.

3. Brokers—*Broker's Contract with Landowner—Construction of Contract —"Reasonable Terms" in Contract Held Applicable as well to the Sale*

*of the Timber on the Land as the Land Itself.*—A broker entered into a contract to sell for a landowner a tract of land. "Price $35,000.00. Terms reasonable. Timber alone without land price $20,000.00. Commissions 10%." In an action by the broker for commissions it was contended that this contract required a sale of the timber for cash; that the phrase "terms reasonable" had no application if the timber was sold separate from the land.

*Held:* That the provision of "reasonable terms" applied to a separate sale of the timber, and that in order to recover the broker was not required to make a cash sale of the timber.

4. INTERPRETATION AND CONSTRUCTION—*Instrument Read as a Whole.*—All written instruments must be read as a whole in order to gather the intention of the parties.

5. INTERPRETATION AND CONSTRUCTION—*Language Taken Most Strongly Against the User.*—In the construction of written instruments, in case of doubt, the language is to be taken most strongly against the party using it.

6. BROKERS—*Real Estate Brokers—Action for Compensation—Verdict upon Conflicting Testimony Conclusive as to the Question of Whether Broker Furnished a Purchaser—Case at Bar.*—In the instant case, an action by a broker for his commissions, the broker procured a purchaser ready, able, and willing to purchase according to the terms authorized by the landowner, and whether or not he produced him to the agent of the landowner was a question upon which the evidence was conflicting, and which was clearly submitted to the jury by the instructions given, and their verdict for the plaintiff was conclusive.

7. BROKERS—*Real Estate Brokers—Action for Compensation—Request by Purchaser that Broker try to Secure the Best Terms—Case at Bar.*—A landowner had listed standing timber with a broker to be sold for a certain price on "reasonable terms." Purchasers agreed to take the timber at the price and on the terms mentioned, but asked the broker to get the best terms he could for them.

*Held:* That this request was no indication of a departure from the terms, but only that, as people might differ as to what were reasonable terms, the purchasers wanted the best reasonable terms obtainable.

8. BROKERS—*Real Estate Brokers—Revocation of Authority—Reasonable Terms.*—A landowner listed standing timber with a broker to be sold at a fixed price upon reasonable terms. The broker furnished a purchaser willing to pay this price and take the timber upon reasonable terms. It was claimed by the landowner that as the size of the timber to be cut, the time within which it was to be removed, and the time and terms of payment were not fixed by the memorandum given to the broker, there could be no compliance with the authority given to the broker until these matters were definitely settled.

6

*Held:* That the phrase "terms reasonable" in the memorandum covered all these matters, and that the broker had a right to present his authority to a proposed purchaser, and when the purchaser agreed to take the timber at the price and on the terms mentioned, and this was communicated to the landowner's agent, it constituted a binding contract.

9. BROKERS—*Real Estate Brokers—Action for Commissions—Revocation by Landowner of Contract with Broker—Case at Bar.*—A landowner listed standing timber with a broker to be sold for a certain price on reasonable terms. In an action by the broker for commissions, it appeared that the broker produced a purchaser ready, able and willing to accept the landowner's offer before any revocation was made or attempted by the landowner. According to the testimony of the defendant, the landowner's agent, when asked to fix the terms, postponed the giving of terms to enable him to consult his brother. Thereafter no terms were given, because in the meantime the land was sold to other parties.

*Held:* That the landowner had no right to revoke the authority of the broker at that time and in that manner.

10. BROKERS—*Real Estate Brokers—Action for Commissions—Evidence Sufficient to Support Verdict.*—In the instant case, an action by a broker for commissions, there was sufficient evidence on behalf of the plaintiff to support the verdict of the jury, if the jury believed the statements of the plaintiff, and the trial court committed no error in refusing to set aside the verdict.

Error to a judgment of the Circuit Court of Nottoway county in an action of assumpsit. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*W. Moncure Gravatt,* for the plaintiff in error.

*Geo. E. Haw,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

This was an action of assumpsit to recover commissions for the sale of standing timber wherein there was a

judgment for the plaintiff, and the defendant assigns error.

The contract on which the action is found is as follows:

## "CEDAR GROVE.

"650 acres land, near Nottoway Falls.    Improved road on both sides.    Fine stock, grass and grain farm. Old fashioned brick mansion.    Estimated timber, four million feet.    Price $35,000.00.    Terms reasonable.

"Timber alone, without land, price $20,000.00.

"Commissions 10%.

"T. F. Epes.

"Agt. for Mrs. J. S. Epes.

"To J. S. Hardaway."

The contract sued on was made solely between T. F. Epes, acting as agent for Mrs. J. S. Epes, on the one side, and J. S. Hardaway, the defendant in error, on the other, both of whom were alive and capable of testifying at the time of the trial.    The action was brought against Mrs. Epes in her life time, but she died before the trial, and the action was revived against her administrator. Hardaway testified as a witness in his own behalf.

[1] Prior to the Code of 1919 he was plainly a competent witness and required no corroboration of any kind. But it is very earnestly insisted before us that, while he is still a competent witness, no judgment can be rendered in his favor upon his uncorroborated testimony, because section 6209 of the Code so provides, and that there has been no such corroboration in this case.    That section is as follows: "In an action or suit by or against a person who, from any cause, is incapable of testifying, or by or against the committee, trustee, executor, administrator, heir or other representative of the person

so incapable of testifying, no judgment or decree shall be rendered in favor of an adverse or interested party founded on his uncorroborated testimony," etc. This section came under review, in some of its features, in *Robertson's Ex'r* v. *Atlantic Coast Realty Co.*, 129 Va. 494, 106 S. E. 521, but the confidence of the able counsel for the plaintiff in error in his position is so great, and his argument so earnest, as well as plausible, that we deem it proper to still further consider who is "an adverse or interested party," within the meaning of the statute.

The statute is highly remedial, and in order to ascertain and give effect to the meaning and intent of the legislature in the use of the phrase "an adverse or interested party," it will be necessary to review the history and development of legislation on the subject.

The common law excluded every witness who had any manner of interest in the result of the litigation, on the theory that "an universal exclusion, where no line short of this could have been drawn, preserves infirmity from a snare, and integrity from suspicion," and so the law continued with us until 1866. By an act approved March 2, 1866 (Acts 1865-6, ch. 21, sec. 1, pp. 87-8), the common law disqualification of interest was abolished.* This act was amended at the next session of the legislature. Acts 1866-7, chapter 170, page 615. The act as amended is found in the Code of 1873 in chapter 172, sections 21 and 22, and is copied in the margin.†

---

*This act repealed an act passed by the Alexandria legislature January 29, 1864 (Acts 1864, chapter XIII).

†"21. No witness shall be incompetent to testify because of interest; and in all actions, suits, or other proceedings of a civil nature, at law or in equity, before any court, or before a justice of the peace, commissioner, or other person having authority by law, or by consent of parties, to hear evidence, the parties thereto and those on whose behalf such action, suit, or proceeding is prosecuted or defended, shall, if otherwise competent to testify, and subject to the rules of evidence and of practice applicable to other witnesses, be competent to give evidence on their own behalf, and shall be competent and compellable to attend and give evidence on behalf of any other party to such action, suit, or proceeding, except as hereafter provided; but in any case at law, the court may, for good cause shown, require any party to attend in person and testify *ore tenus*, or exclude his deposition upon his failure to attend."

It will be observed that the act, while radically changing the common law rule, contained many qualifications and exceptions. It was far from perfect, and had to be changed or amended from time to time to meet the hardships of different cases as developed by the decisions of this court. It would be impracticable within reasonable limits to discuss all the cases construing the statute and the consequent legislative changes. Most of them will be found in the notes to sections 3346 to 3349 of the Code of 1904. All of them, however, will be found to be in the extension of the competency of witnesses to testify. There was no backward step at any time, and it was several times said by this court, in considering one or more of these statutes, that the object of the statute was to remove incompetency in certain cases and not to create it in any case. *Reynolds' Ex'r v. Callaway's Ex'r*, 31 Gratt. (72 Va.) 436; *Goodell's Ex'rs* v. *Gibbons*, 91 Va. 608, 22 S. E. 504. This policy is manifested by some of the decisions of this court which were followed by acts of the legislature which changed the law as announced in the prior decision. In *Knick* v. *Knick*, 75 Va. 12, Samuel G. Knick was incompetent to testify because he was an original party to the transaction which was the subject of investigation and interested in the result, and the other party, his mother, was dead. His brothers and sisters were claiming the land in controversy as heirs of their mother, and of course, were interested in the result. They were per-

"22. Nothing in the preceding section shall be construed to alter the rules of law now in force in respect to the competency of husband and wife as witnesses for or against each other, during the coverture or after its termination, nor in respect to attesting witnesses to wills, deeds, or other instruments; and where one of the original parties to the contract or other transaction which is the subject of the investigation, is dead, or insane, or incompetent to testify by reason of infamy, or any other legal cause, the other party shall not be admitted to testify in his own favor, or in favor of any other party having an interest adverse to that of the party so incapable of testifying, unless he shall be first called to testify on behalf of such last mentioned party; and where one of the parties is an executor, administrator, curator, or committee, or other person representing a dead person, an insane person, or a convict in the penitentiary, the other party shall not be permitted to testify in his own favor, unless the contract or other transaction in issue, or subject of investigation, was originally made or had with a person who is living and competent to testify, except as to such things as have been done since the powers of such fiduciary were assumed."

mitted to testify, however, to the terms of the contract
between their mother and Samuel G. Knick because
they were not original parties to the contract. This
seemed manifestly unjust so the legislature amended
what is section 22 of chapter 172 of the Code of 1873
(Laws 1876-77, c. 256), by inserting "or unless some
person, having an interest in or under such contract or
transaction, derived from the party so incapable of tes-
tifying, has testified in behalf of the latter or of him-
self, as to such contract or transaction." A similar case
arose after the amendment, and of course the result was
different from the holding in *Knick* v. *Knick, supra.*
See *Brock* v. *Brock,* 92 Va. 173, 23 S. E. 224. This
amendment will be found in its appropriate place in sec-
tion 3346 of the Code of 1904. In *Carter* v. *Hale,* 32
Gratt. (73 Va.) 115, where there were several living
obligors to a bond, one of them died and two suits were
brought; one against the surviving obligors and the
other against the personal representative of the de-
ceased obligor. The deceased obligor was a mere surety
on the bond. The principal was still living and was
offered as a witness to show that he delivered to the
obligee certain bonds, which the obligee undertook to
collect and apply to the bond in suit. It was objected
that the plaintiff could not testify because one of the
obligors was dead, and as the plaintiff was thereby dis-
qualified, so were all the defendants. It will be ob-
served here that what was offered to be shown was a
transaction between the plaintiff (obligee) and the prin-
cipal in the bond, both of whom were living; but the
court held that the objection was good; that the de-
ceased obligor was one of the original parties to the
transaction which was the subject of investigation, and
that as the plaintiff could not testify the other defend-
ants could not. The decision in this case was rested

upon the previous cases of *Grigsby* v. *Simpson*, 28 Gratt. (69 Va.) 348, and *Mason* v. *Wood*, 27 Gratt. (68 Va.) 783.

These decisions led to the enactment of what constitutes section 3347 of the Code of 1904, rendering the survivors on both sides competent.

So in *Goodell's Ex'rs* v. *Gibbons*, 91 Va. 608, 610, 22 S. E. 504, in speaking of section 3348, Codes 1887, 1904, it is said the object of the statute was not to impose disqualification of witnesses that did not theretofore exist.

Section 3349, Code 1904, permitted the deposition of a witness who had died since his deposition was taken to be proved and read, and provided that if this was done "the adverse party may testify as to the same matters," thus modifying the law as laid down in *Keran* v. *Trice*, 75 Va. 690.

We have mentioned particularly sections 3346, 3347, 3348 and 3349 of the Codes of 1887 and of 1904 because they represent the progressing state of the law at the time the Code of 1919 was enacted, and are the sections repealed by the latter. In all of these cases there was a living witness who could testify to the "contract or other transaction which was the subject of investigation," and in none of them was any corroboration required.

At the time of the revision of 1919 there were also various other disqualifications, or limitations upon the competency of witnesses. Felons could not, as a rule, testify unless pardoned or punished, and a person convicted of perjury could not testify although pardoned or punished. Code 1904, section 3898. Legatees and devisees under a will, to which they were subscribing witnesses, were restricted as to the amount they could take under the will, if the will could not be otherwise proved. Code 1904, section 2529. There were various restric-

tions on the rights of husbands and wives to testify for or against each other in civil and criminal cases. Code 1904, section 3346a.

Such was the condition of the statute law of the State when the revisors undertook to make "material changes in the law governing the competency of witnesses to testify," so as to remove "practically all disqualifications," and permit the courts to hear "all evidence bearing on the question at issue" just as is usual "in the business affairs of life." In pursuance of this policy the law with reference to the testimony of those convicted of felony or perjury was changed so as to declare that "conviction of felony or perjury shall not render the convict incompetent to testify, but the fact of conviction may be shown in evidence to affect his credit." Code, section 4779. See also section 4495. The law with reference to the competency of legatees and devisees as attesting witnesses was changed so as to relieve them of the forfeiture under the old law. Code, section 5244, and notes. The law with reference to the testimony of husband and wife, for or against each other, in civil and criminal cases was materially changed in favor of their competency, but in view of their extended capacity to testify, it was provided that a divorce should not be granted "on the uncorroborated testimony of the parties or either of them." Code, sections 6210, 6211, 5106. In no case where competency was involved did the revision add any restriction to the existing law, unless such restriction grew out of, and was deemed needful in consequence of, some new power or right conferred.

The former statute on the subject of incompetency of the survivor of a transaction, described the incompetency of the adverse party as arising "by reason of death, insanity, infancy or other legal cause." This

was construed as practically meaning "any cause," so in the new statute, the shorter phrase "any cause" was used. The former statute contained numerous qualifications, as set forth in section 3346, Code 1904, and numerous exceptions set forth in sections 3347, 3348 and 3349, Code 1904, all of which have been hereinbefore mentioned and discussed. Here, as in the other statutes mentioned, it appears to have been deemed best to *extend* the class of witnesses who should be rendered competent to testify, and, in view of the extension, to add the requirement of corroboration. So when the Code as a whole was presented to the legislature for enactment in 1918, it was accompanied by a printed report of the revisors. In this report, under the head of "Substantial Changes," the revisors said:

"The subject of the competency of witnesses to testify was one that received very careful consideration by the revisors. Nearly all of the difficulties that have arisen in practice have grown out of the exceptions to the rule that interest should not disqualify a witness. In the draft submitted the revisors have removed practically all disqualifications except to protect confidential communications, especially between husband and wife. In order to meet the difficulties that may arise in consequence of a *removal of disqualifications*, the revisors have added a new section declaring: In an action or suit by or against a person who, from any cause, is incapable of testifying, or by or against the committee, trustee, executor, administrator, heir, or other representative of the person so incapable of testifying, no judgment or decree shall be rendered in favor of an adverse or interested party founded on his uncorroborated testimony; and in any such action or suit, if such adverse party testifies, all entries, memoranda, and declarations by the party so incapable of testifying

made while he was capable, relevant to the matter in issue, may be received as evidence. It was believed that this section, together with the great safeguard of cross-examination, would be ample protection for the estates of persons laboring under disability or who are incapable of testifying. In the business affairs of life all evidence bearing upon the question at issue is received and considered by the business world, and it seemed proper that the same rule should obtain in courts of justice which are enforcing rights arising out of such business transactions." (Italics supplied.)

There is no intimation of an intention to place any burden or restriction upon witnesses then competent to testify, nor was there any reason for such, as the former statutes imposed none, and under the many decisions of this court construing them there is no intimation of any necessity for such. On the contrary, the report plainly indicates that the protection to be afforded by section 6209 and "the great safe-guard of cross-examination" was against this new class of competents who could testify to contracts or transactions to which there was no other living witness. This appears still plainer from the following extract from the notes of the revisors to that section:

"Section 3345 of the Code of 1887 (section 6208 of this Code unchanged) removed common law disqualifications on account of interest or because a party. The exceptions referred to in the above excerpt were imposed by section 3346 of the Code of 1887, for the most part, which exceptions were in turn qualified by sections 3347, 3348 and 3349 of that Code. The principal exception and one which was most fruitful of litigation was that pertaining to the survivor of a transaction. Most of the States still retain this exception, but in at least two States other than Virginia it has been abol-

ished. (New Mexico and Connecticut.) The objections to the principle of the survivor of a transaction rule cannot be set forth in a note of this character, but they will be found well and ably discussed by Mr. Wigmore, a distinguished authority, in his work on Evidence (1 Wig. Ev., section 578). The objections to the rule in actual operation are best illustrated by the numerous cases which arose under the former law, some of which were of such a character as to call for amendment of the sections by which they were governed."

[2] It may be conceded that the language of the statute does not plainly limit corroboration to a restricted class of those rendered competent by section 6208, and that the primary source of ascertaining the meaning of a statute is the language used in it. But the statute is highly remedial in its nature, is one of a series of statutes removing the incompetency of witnesses to testify, and was reported by the revisors as intended to remove "practically all disqualifications" except confidential communications, and that "in the business affairs of life all evidence bearing upon the question at issue is received and considered by the business world and it seemed proper that the same rule should obtain in courts of justice which are enforcing rights arising out of such business transactions." The former statutes did not require corroboration in any case, and they were construed to enlarge the competency of witnesses to testify and not to create incompetency in any case. The policy of the former statutes was thus declared by legislative enactment and judicial construction. The present section was enacted "in order to meet the difficulties that may arise in consequence of a removal of disqualifications," by the new enactments, not to create disqualifications, nor to require corroboration or addi-

tional proof where none was required prior to the new enactments.      But as a new class of witnesses were made competent by the Code, and it could not be foretold with certainty how far their testimony might injuriously affect the estate "of persons laboring under disability or who are incapable to testify," section 6209 was enacted to afford such protection.      No such protection had ever been deemed necessary as to witnesses who were competent before the enactment of the Code, though the statutes have been in operation for many years.      It would seem inevitable, therefore, that this new requirement of corroboration was applicable only to the new class of witnesses made competent for the first time by the Code of 1919.      We therefore adhere to what was said on this subject in *Robertson's Ex'r* v. *Atlantic Coast Realty Co., supra,* "The revisors, for the reasons stated by them, deemed it wise to remove practically all disqualifications.      They recognized, however, that in making such removal, and especially in the case of the survivor of a transaction which had been adopted in only a few States, there should be some compensatory advantages.      Hence, they said that in order to meet the difficulties that might arise in consequence of the removal of the disqualifications which they had effected by the repeal of various sections of the then existing law, they added section 6209.      They required corroboration only of those witnesses whom they had rendered competent to testify by the repeals aforesaid, and not of witnesses already competent.      The purpose of the revisors was to remove disqualifications, not to create them in any case, nor to impose burdens on witnesses already competent."      We are of opinion that the corroboration required by section 6209 is applicable only to that class of witnesses who were made competent for the first time by the Code of 1919, and that, no cor-

roboration is required of those witnesses who were competent before the Code of 1919 became operative, and who did not then require corroboration.

We have given this review of the statute out of deference to counsel, and for guidance in the future, but, in the case at bar, if corroboration were necessary, we are of opinion that defendant in error was sufficiently corroborated.

It is admitted that the paper sued on was executed by T. F. Epes as agent for Mrs. Fannie W. Epes, and that he had authority from her to execute it; and the evidence establishes the fact that Hardaway showed the timber on the land to Mr. Francis and to Mr. Lipscomb, a representative of the Lipscomb Lumber Company; that they were ready, able and willing to buy the timber at $20,000.00, on reasonable terms, and so stated to Hardaway and requested him to see Mr. Epes and get the best terms he could, and get him to come to Richmond the next day, when they would be ready to settle. The main point of difference between the plaintiff and the defendant was whether such purchasers were *produced to the owner* of the timber before the power of Hardaway was revoked by a sale of the timber to another purchaser. On this point there was a decided conflict between the testimony of Hardaway, and of T. F. Epes, who was first examined by the plaintiff to prove his agency, and afterward by the defendant to show the negotiations and dealings between them with reference to the sale. Hardaway testified that he showed the timber to Mr. Francis, of the firm of Francis Bros., and offered it down to eight inches across the stump, twelve inches above the ground, to be removed in three years, at $20,000.00, on reasonable terms:

That Francis was interested and said he would like to get his partner, in the purchase, the Lipscomb Lum-

ber Co., to look at it; that, therefore, Hardaway called
T. F. Epes on the 'phone and told him that Mr. Francis
was interested, but wished to have his partner look at
the timber, that Epes asked at what price he had shown
it and Hardaway stated $20,000.00, that Epes told him
he would wait for Mr. Francis's partner to look at it at
$20,000.00 but not to show it to anyone else at less than
$25,000.00; that this was Friday, and on the following
Tuesday (December 3, 1919), Hardaway took Mr.
Francis and Mr. Lipscomb of the Lipscomb Lumber
Company over the timber and that they agreed to take
it down to eight (8) inches across the stump at $20,-
000.00 on reasonable terms, and told him to see Mr.
Epes and get the best terms he could and to meet them
in Richmond the next day and they would close the
deal; that Hardaway on that same day drove to Black-
stone and saw Mr. Epes and stated to him that Francis
Bros., and Lipscomb Lumber Co., would take the tim-
ber at $20,000.00 to eight (8) inches across the stump
on reasonable terms, but wished him to give the best
terms he could, that Epes said that was all right, that
he had authority to close but would prefer to talk to
his brother Theo., who was out of town, and that he
would see Theo. and submit Hardaway a proposition
on Monday; that he, Hardaway, 'phoned Epes on Mon-
day and Epes said he had not decided anything, but
would let him know on Tuesday, and on Tuesday Hard-
away went to see Epes, to ascertain his terms, but he
did not give any, and stated that he had an offer of
$20,000.00 net from another party and that he would
let that party have it as he would be gaining $2,000.00
on the deal.   He sold to the other party before giving
Hardaway any terms.

A few days afterwards (within a week) Hardaway,
hoping to induce Epes to let the purchasers have the

timber, got an offer from the purchasers to pay the whole $20,000.00 in cash and remove the timber in three years, which he communicated to Epes; that Epes said that three years was a reasonable time within which to remove the timber, but that he did not care anything about all cash, and that he had sold the timber to another party.

T. F. Epes was the only witness offered by the defendant. He denied that Hardaway ever made any specific offer, on behalf of the alleged purchasers, to purchase the timber on Cedar Grove. His account of what took place at the time of the alleged offer is:

"5. After Mr. Lipscomb and Mr. Francis had seen the Cedar Grove timber did Mr. Hardaway come to Blackstone to see you?

"A. Yes, sir.

"6. What did Mr. Hardaway tell you on this occasion with reference to this timber?

"A. Mr. Hardaway told me that he had taken these gentlemen over the timber and that they had come back and were pleased with the timber; that they had not made any objection to the price, they were the words he used, and that they wanted him to get from me the best terms he could get. I told Mr. Hardaway, I said 'Let your people—haven't you got a proposition from your people to me?' He says, 'No, they refused to make any proposition and asked me to get from you the best proposition I could get.' I told him that I could not make him any until I saw my brother Theo., who was at that time out of town and probably would not be back until Saturday, but that as soon as I could see Theo. I would see if we could not submit a proposition to him.

"7. Did he state to you in any of these conversations that these people were ready and willing and able to buy this timber and wanted to buy it?

"A. No, he said nothing about that one way or the other."

In a letter subsequently written by Epes to Hardaway he says, amongst other things:

"I remember very distinctly that you told me that they made no objection to the price, and you were sure the price was satisfactory, their only enquiry being as to terms on the money, size and time for removal of the timber. I then asked you what they wanted and you told me they refused to say, asking you to get the best you could from me, and if we could agree on those they thought they could handle the timber. I told you then that I would have to consult with Theo., who was out of town and would not be back until Saturday or Sunday, and would inform you Monday what we could do. The kind of timber they wanted was also left out. In the meantime we sold the timber to other parties, without my ever giving you any of the above information. I always understood that they refused to make any proposition and their purchase of the timber depended entirely on whether we could reach a satisfactory agreement on the terms, size of timber, kind of timber, of removal, etc."

The sale of the Nottoway Shook Company was at the price of $18,000 and embraced practically all the timber on the place; only a few little trees for yard purposes and a few scattered walnuts—about 1,500 feet, being reserved. Epes admitted that eight inches at the stump and three years for removal were reasonable terms, but claimed that he had no authority to fix or to accept any terms, that these were subjects to be fixed by his mother, and that his powers were exhausted when he executed the paper in suit. When asked by the trial judge what his mother said when she told him to put the timber, or the land, in the hands of a land agent, he replied:

"A. Judge, it come about this way. The property belonged to my mother and was her property. The children would get together and talk over things that were done in reference to it before her, where she was, and would say what we thought we ought to be able to realize out of it, and in talking over this, when we thought that the timber should be sold for $20,000.00 with a ten per cent. commission, and that the terms on it as to the size and time, and so on, would vary according to the conditions of the purchaser, she would say 'well, that is all right. If you all think that, that will be all right with me'—that was about the way the thing was given."

[3-5] It is claimed on behalf of Mrs. Epes' estate that the written memo. sued on required a sale of the timber for cash; that the phrase "terms reasonable" had no application if the timber was sold separate from the land. In this view we cannot concur. All written instruments must be read as a whole in order to gather the intention of the parties, and in case of doubt language is to be taken most strongly against the party using it.

In *White* v. *Sayers*, 101 Va. 828, 45 S. E. 747, it is said: "In the construction of a contract the whole instrument is to be considered; not any one provision only, but all its provisions; not the words merely in which they were expressed, but their object and purpose, as disclosed by the language, by the subject matter, and the condition and relation of the parties. *Miller* v. *Kephart*, 18 Gratt. (59 Va.) 1." See also *Bank of Old Dominion* v. *McVeigh*, 32 Gratt. (73 Va.) 530; *Tate* v. *Tate's Ex'r*, 75 Va. 522. We are satisfied that "reasonable terms" applied to a sale of the timber separately as well as to the sale of the land with the timber on it.

7

After the evidence was all in, the plaintiff asked for two instructions and the defendants for five. The court granted the two asked for by the plaintiff and refused all five of those asked for by the defendant. This ruling of the court was excepted to by the defendant. In addition to the two instructions granted for the plaintiff, the court gave two other instructions. The record does not disclose at whose instance the latter two were given, but it was stated at the bar that they were given at the instance of the defendant after the court had refused the five instructions tendered by the defendant. No exception was taken to the granting of these two. The five instructions tendered by the defendant and rejected by the trial court were as follows:

"I. The court instructs the jury that it was incumbent upon the plaintiff to produce a purchaser ready, able and willing to purchase the timber for the sum of $20,000.00—and the jury must believe that the offer was made to purchase said timber for $20,000.00 upon such time for getting the timber off as was reasonable and usual in such cases and down to such sizes as was usual in such cases, and to pay the money upon such terms as Mrs. Epes or T. F. Epes, her agent, might specify, and if the jury believe that these things were not done, then they should find for the defendant.

"II. The court instructs the jury that in order for the plaintiff to recover in this case he must prove by a preponderance of the testimony (1st) that he had authority from Mrs. Epes to sell the timber on 'Cedar Grove' for $20,000.00—cash or upon terms and conditions which she would accept—and (2nd) that in pursuance of said authority he did sell or produce a purchaser of said timber, who was ready, able and willing to buy said timber for said price, and upon said terms, and that he communicated these facts to T. F. Epes, or

produced said purchaser to T. F. Epes prior to the sale of the timber to other parties.   If the jury believe from the evidence that he failed to do any of these things, they should find for the defendant.

"III. The court instructs the jury that if they believe from the evidence that the terms and conditions on which said timber could be sold by the plaintiff were left open in said memorandum and for future negotiations between the plaintiff or his purchaser and Mrs. Epes, and that these terms and conditions, such as manner of paying purchase money, size and time of removal of timber, were never agreed upon between plaintiff or his alleged purchaser and Mrs. Epes, then the jury should find for the defendant.

"IV. The court instructs the jury that Mrs. Epes being dead, the law does not permit the plaintiff to recover on his own uncorroborated testimony, and as he has no testimony corroborating his testimony with reference to his communication of his alleged offer of purchase of the timber by Francis and Lipscomb to T. F. Epes, then the jury could find for the defendant.

"V. The court tells the jury that the mere reasonableness of the terms on which Francis and Lipscomb might have been willing to buy the timber are not to be considered, but they must buy, if at all, on such terms and conditions as to payment of purchase money, size and time of removal of timber, as Mrs. Epes might be willing to accept."

The four instructions given by the court were as follows:

"VI. Court instructs the jury that if they believe from the evidence that the plaintiff did not submit to T. F. Epes a definite offer to purchase the timber on Cedar Grove for $20,000.00, on such terms and conditions as he or Mrs. Epes would give, then they should find for the defendant.

"VII. The court instructs the jury that if they believe from the evidence that the only offer that was made to T. F. Epes was this, that Mr. Hardaway said to him, that they. had not made any objection to the price and that the prospective purchasers wanted to get from him the best terms he could get, 'I said "Haven't you got a proposition from your people to me?" He says "No, they refuse to make a proposition and asked me to get from you the best proposition I could get," and I told him I could not make a proposition,' etc., then this is not a definite proposition, and they should find for the defendant.

"VIII. If the jury believe from the evidence that J. S. Hardaway was authorized by T. F. Epes, agent for Mrs. J. S. Epes, to sell the timber on the Cedar Grove tract at $20,000.00 on reasonable terms, and upon a commission of ten per cent., and that Hardaway procured a purchaser who offered to and who was ready and willing to purchase the said timber at $20,000.00 on such terms as said Epes would give, and that the said offer was by Hardaway submitted to the said Epes, and that the said Epes thereupon, without objecting to such terms or fixing any terms, refused to accept the said offer, then the jury are instructed that Hardaway has earned his commissions and they must find for the plaintiff in the sum of $2,000.00. .

"IX. The court instructs the jury that if they believe from the evidence that J. S. Hardaway was authorized to make sale of the timber on the Cedar Grove tract at $20,000.00 upon reasonable terms, and that he secured a purchaser who was ready, able and willing to purchase the said timber at $20,000.00, and who offered to purchase it at $20,000.00 upon reasonable terms,. and that the said Hardaway submitted to T. F. Epes; agent for the. defendant, said offer and told him

that the purchasers were willing to pay $20,000.00 on
such terms as the said Epes will allow, and that, with-
out discussing the question of terms, the said Epes re-
fused to accept said purchasers at said price, then the
jury are instructed that the fact that no terms had been
agreed upon is immaterial in this case, because the re-
fusal of the said Epes to consider the price of $20,000.00
and the purchasers offered, prevented any further ne-
gotiation, and thereupon the plaintiff became entitled
to his commissions and the jury must find in favor of
the plaintiff in the sum of $2,000.00.''

Instruction IV refused by the court was on the sub-
ject of corroboration of Hardaway.    No error was com-
mitted in refusing this instruction.    The reasons for
this conclusion have been hereinbefore fully set forth.
Instructions 6 and 7 presented certain phases of de-
fendant's theory of the case, and left it to the jury to
determine whether they should accept the testimony of
Hardaway or that of T. F. Epes on the subjects men-
tioned in the instruction, and in effect told them if they
accepted the testimony of Epes they should find for the
defendant.    No exception was taken by either party to
the giving of these two instructions, and hence no error
is assigned to the action of the court in granting them.
The objections to the rulings of the trial court on the
remaining instructions were discussed as a whole and
not *seriatim* in the petition for the writ of error, and
the same course will be pursued here.

Counsel for the plaintiff in error insists that the error
of the trial court in granting and refusing instructions
as aforesaid consists in failure to give a proper inter-
pretation of the contract, the failure to recognize the
right of Epes to cancel the power given to Hardaway,
and the failure to give any instruction which adequately
and properly presented the defendant's theory of the

case.   In the first place it is insisted that under the terms of the writing Hardaway could only sell the lumber for cash.   This, of course, is based upon the assumption that the words "terms reasonable," in the written authority given to Hardaway, did not apply to a sale of the timber apart from the land, but we have already stated our opinion to the contrary, and the reasons therefor.   It is further insisted that Hardaway has not borne the burden imposed upon him by law to prove· that he had  produced a  purchaser ready, able and willing to buy upon the terms and strictly pursuant to the authority given him, and (2) that Hardaway was a special agent and bound to strictly comply with the terms imposed by his principal.   In support of the first proposition counsel cite and quote from *Low Moor Iron Co.* v. *Jackson*, 117 Va. 76, 84 S. E. 100, as follows:

"The burden of showing that the purchaser is able, ready and willing to purchase rests ordinarily on the broker in his action for commission for negotiating a sale.

"A real estate broker to be entitled to compensation must show that he had completed his undertaking according to its terms, or that its completion was prevented without his fault by his principal at a time or under circumstances when the latter had no right to interfere."

Further—

"A real estate broker is entitled to his commission when he produces a purchaser able and willing to buy on terms authorized by his principal."

He also makes the following quotation from *Bowles* v. *Rice*, 107 Va. 51, 57 S. E. 575:

"A special agent is defined to be 'one who is authorized to do one or  more specific acts in pursuance of particular instructions, or within restrictions necessarily

implied from the act to be done.'   1 Am. & Eng. Enc. L. 985.   Persons dealing with such agent do so at their own risk, and cannot rely upon his assumption of authority, but must inform themselves of the extent of his powers.

"*   *   *   It is equally well settled that a party dealing with an agent acting under a written authority must take notice of the extent and limits of that authority.   He is to be regarded as dealing with the power before him; and he must at his peril observe that the act done by the agent is legally identical with the act authorized by the power.

"It is also settled law that the powers of a special agent are to be strictly construed.   He possesses no implied authority beyond what is indispensable to the exercise of the power expressly conferred, and must keep within the limits of his commission.

"*It is, moreover, the accepted rule that, in the absence of authority to the contrary, a power to sell implies a cash sale.   (Burks* v. *Hubbard,* 69 Ala. 379; 1 Am. & Eng. Enc. L. 1014; 24 Am. & Eng. Enc. L. 1095, and authorities cited, note 10.)"

[6, 7, 8] That Hardaway did procure a purchaser ready, able and willing to purchase according to the terms authorized by Epes is fully established by the testimony in the cause, and whether or not he *produced him to Epes* was a question upon which the evidence was conflicting and which was fully and clearly submitted to the jury by the instructions given.   It seems to be contended for the plaintiff in error that because the memorandum given to Hardaway did not state the size of the timber to be cut, the time within which it was to be removed, and the time and terms of payment, there could be no compliance with the authority given to Hardaway until these matters were definitely settled.

The memorandum given to Hardaway said "terms reasonable," which coverd all these matters. Hardaway had the right to present his authority to a proposed purchaser, and when the purchaser agreed to take the timber at the price and on the terms mentioned therein, and this was communicated to Epes, it constituted a binding contract for the sale of the timber, and the jury were so instructed.   In the case at bar, Epes admitted that eight inches in diameter and twelve inches above the ground, and three years within which to remove— which were the terms given by Hardaway to the purchasers—were reasonable terms, and that all cash was not a special consideration. When the purchasers asked Hardaway to get the best terms he could for them, that was no indication of a departure from the terms given to Hardaway.   They had seen the authority under which Hardaway was acting, and the request only meant that as people might differ as to what were reasonable terms, they wanted the best reasonable terms that Epes would give.   We find nothing in the cases cited that is inconsistent with the instructions given by the trial court.

[9] It is further insisted that Epes had the right to revoke the authority given to Hardaway and that he did so before any purchaser was produced to him.   According to the testimony of Hardaway he did produce a purchaser ready, able and willing to accept the offer according to its terms before any revocation was made or attempted.   According to the testimony of Epes, when he was asked to fix the terms he postponed the giving of terms till the following Monday to enable him to consult his brother.   No terms were given on Monday, and on Tuesday they were refused, because "in the meantime we sold the timber to other parties, without ever giving you any of the above information."

Epes had no right to revoke the authority of Hardaway at that time and in that manner. If real estate brokers could be thus deprived of their commissions, it would be very difficult for them ever to earn their compensation. When Hardaway produced a purchaser ready, able and willing to comply with the terms of the memorandum given to Hardaway by Epes, then Hardaway was entitled to his commissions, and Epes could not revoke, during the period fixed by him for arranging the details of terms, by selling to another person. *Foltz v. Conrad Realty Co.*, 131 Va. 496, 109 S. E. 463, and cases cited. Whether Hardaway did in fact produce such a purchaser to Epes we have seen was properly submitted to the jury by the instructions given.

The instructions given rightly construed the contract of the parties, and adequately submitted to the jury every question of fact to be decided by them. There was no error in the rulings of the trial court in granting and refusing instructions.

[10] There was abundant evidence on behalf of the defendant in error to support the verdict of the jury, if the jury believed the statements of Hardaway, and the trial court committed no error in refusing to set it aside. *Carter v. Old Dominion Ry. Co.*, 122 Va. 458, 95 S. E. 464, and cases cited.

Upon the whole case, we are of opinion that the judgment of the trial court should be affirmed.

*Affirmed.*