[No. 579.  Decided November 30, 1892.]

JAMES GUTHRIE *et al.*, *Respondents*, v. JAMES TULLOCK *et al.*, *Appellants.*

TRUSTS — LAND PURCHASED BY CONTRIBUTIONS — EXECUTION OF TRUST.

A mere general contribution to a fund for the purchase of land, the title of which is taken in another, will not create a trust in favor of the donor, unless at the time of the purchase it is understood he is to have a certain proportion or aliquot part of the whole tract purchased.

A number of persons contributed funds for the purchase of certain government land to be used for cemetery, church, school and other purposes, with the understanding that each should have a right to vote on all questions affecting the land purchased, and each should have a lot in the cemetery to be laid off therein.  At a meeting of the contributors three of their number were selected as trustees to acquire title from the government, and it was decided that the trustees should manage and dispose of the property in accordance with a majority vote of the contributors present at any called meeting, seven to constitute a quorum.  After most of the land had been disposed of for various purposes, a meeting of the original contributors was held, pursuant to call, at which it was proposed to sell the land used for cemetery purposes and secure other ground more favorably situated and adapted to the purpose, and give each subscriber to the original fund a lot in the new cemetery, in lieu of his interest in the old.  A majority of those assembled at the meeting voted to sell, and the trustees accordingly sold and conveyed said land, and with part of the proceeds of sale purchased other ground for cemetery purposes, and conveyed the same to a corporation organized for the purpose of receiving and controlling it.  The balance of the money received from the sale was deposited in bank to be used in improving and embellishing the grounds.  Some of the contributors to the original fund, who were opposed to the sale, brought an action to have the sale and conveyance by the trustees canceled and annulled, on the ground that it was a violation of their trust.  *Held*, That, conceding that the land was impressed with trust, the trust has been executed in accordance with the expressed will of the *cestuis que trust*.

*Appeal from Superior Court, San Juan County.*

*Ballinger & Ballinger,* and *Hughes, Hastings & Sted-
man,* for appellants.

*R. W. Jennings, A. R. Coleman,* and *W. S. Bush,* for
respondents.

The opinion of the court was delivered by

ANDERS, C. J.— This action was brought by the respond-
ents against the appellants for the purpose of having can-
celed and annulled a certain conveyance of land made by
appellants Tullock, Adams and Fry, to appellants Harri-
son, on the ground that the same was made by said grantors
as trustees of respondents and others having a common in-
terest, but too numerous to be joined as plaintiffs, in viola-
tion of their trust, and was received by said other appellants
with full notice and knowledge thereof.

It is not disputed that the legal title of the land in con-
troversy was in the grantors at the time they executed the
deed, but it is claimed by respondents that as they and
others, including said grantors, contributed the funds with
which the land was originally purchased, a trust was thereby
created therein by operation of law, and, further, that said
grantors at all times acknowledged such trust.

The material facts, which are satisfactorily shown by the
record, are these: Prior to the year 1883, the inhabitants
of Orcas island, or that portion of them near Arbutus
Point on East Sound, had used a portion of lot 1, in section
14, township 37 north, range 2 west, which was then gov-
ernment land, as a public burying ground.   In the early
part of that year it was thought desirable by some of the
inhabitants of that portion of the island to obtain the title
of said lot 1, in section 14, from the United States, and ac-
cordingly a few of the people met together informally at
East Sound and chose appellants Fry, Tullock and Adams
a committee to ascertain, by correspondence with the land

office, the steps necessary to be taken to purchase said land. It was ascertained by them that the government would not sell lot 1 of section 14 alone, but would sell that lot in connection with lot 1 in section 13, in the same township and range, and it was then concluded to purchase both tracts, being all of Arbutus Point, and containing about twenty-six acres. A committee of three was appointed to solicit contributions. They canvassed the island, and the people generally contributed a dollar each towards paying for the land, though some of them seem to have given a larger sum, and some money was contributed by non-residents of the island. The land was purchased with the funds so raised, and the patent was issued in the names of said Fry, Tullock and Adams, who were also contributors. It does not appear that any of the contributors were to have any fixed, certain or aliquot part of the whole tract, but it was the general understanding that each one should have a burial lot in the cemetery, the dimensions of which were never fixed, and a right to vote at meetings. In all other respects the contributors were to have no rights other than those enjoyed in common by all the other residents of the island.

By reason of their contributions merely, the respondents in this case are not entitled to any rights in the property purchased, for it is well settled that a mere general contribution to a fund for the purchase of land, the title of which is taken in another, will not create a trust in favor of the donor, unless at the time of the purchase it is understood that the person contributing to the fund is to have a certain proportion, such as a half, quarter, or other aliquot part of the whole tract purchased. *McGowan v. McGowan,* 14 Gray, 119; *Buck v. Warren,* 14 Gray, 122; *Sayre v. Townsends,* 15 Wend. 647; *Perry v. McHenry,* 13 Ill. 227; *Olcott v. Bynum,* 17 Wall. 44; 1 Perry on Trusts, § 132. It is quite common for societies having in

charge the building of churches or public hospitals to solicit subscriptions for the purpose, but no one ever supposed that by such general donation he became an equitable owner, *pro tanto*, of such church or hospital.

It is conceded, however, in this case that there was a trust of some character, and that the three appellants above named held the property in dispute in trust for some purposes. But what all of these purposes really were we have had no little difficulty in ascertaining.

According to the testimony of some of the witnesses it was for cemetery, church and school purposes, while according to the testimony of others the property was to be used for the purposes mentioned, and also for wharves, stores, school houses, public hall, and all other purposes not immoral. It is quite certain, however, that it was the desire and intention of the people generally who were interested in buying the property to secure a cemetery not on the public lands of the United States, in other words that the lands should be at least partially devoted to that purpose. It is alleged in the complaint that the land was to be held by said trustees for a burying ground, and for other religious purposes. But about the time of the purchase a public wharf was built by the joint labors of the contributors. Afterwards a portion of the land was sold by the grantees of the government to private individuals, for the purpose of carrying on a store, and another portion was sold to the Emanuel church. The first of these sales seems to have been made in 1887, and both were authorized by a majority vote of the contributors present at called meetings. We think it is fairly established by the evidence that at the meeting of the contributors, in December, 1883, it was decided that the trustees should manage and dispose of the property in accordance with a majority vote of the contributors present at any called meeting, and that it was also agreed that seven members attending should constitute

a quorum.  Other propositions were discussed at that meeting, but not carried out.  For instance, it was proposed to organize a corporation to take and hold this land, but no such organization was perfected, and the three appellants, Fry, Tullock and Adams, continued to hold the title to the land acquired in their names until disposed of by direction of the people whose interests they represented.

It appears that the portion of the land remaining unsold in the year 1890, excepting two or three acres thereof, theretofore used as a cemetary, was uneven, rocky and unsuitable for burial purposes, or general business purposes. A village had grown up near the wharf or landing, and adjoining the cemetery.  And the trustees deemed it advisable to dispose of the balance of the property held by them, and to remove the old cemetery to another and more eligible site.  A meeting of the original contributors was accordingly held at which the proposition to sell the remaining land, and to buy other property for a burying ground, was presented.  The plan advanced by those favoring the sale was to secure other ground favorably situated and adapted to the purpose, and to remove the bodies interred in the old cemetery to the new one without any expense to the relatives of those buried there, and to give to each subscriber to the original fund a lot in the new cemetery, in lieu of his interest in the old one.  A majority of those assembled at the meeting voted to sell, and the trustees accordingly sold and conveyed the property in controversy to appellants Harrison and Harrison, for the sum of $500, which was paid on the delivery of the deed.  No larger sum was offered, and we think the property could not, at the time, have been sold for more than that sum.  With $135 of the proceeds of the sale, the trustees purchased other ground in every way adapted to the purposes of a cemetery, about five eighths of a mile distant, caused it to be regularly laid off and platted, and conveyed the same to a

corporation organized for the purpose of receiving and controlling it. The remainder of the money received from the sale was deposited in bank by the trustees to be used in improving and embellishing the grounds.

The respondents claim that this action of the trustees was a violation of their trust, and a perversion of the trust property from the purposes for which it was intended. The learned judge who tried the cause came to this conclusion, and accordingly decreed a cancellation of the deed to the Harrisons. In this we think he erred. In all of the great mass of testimony in the record we see nothing suggestive of bad faith, or unfairness, on the part of these appellants who acted as trustees. If any one object, among the many claimed by those who contributed towards the original purchase price, for which this land was acquired is shown by the testimony, it is that it was to be used for cemetery purposes. For that purpose the land was sold, and to that use the proceeds of the sale have been devoted. Every one who desires can select a lot in the new cemetery, and several of the contributors have already done so, "without money and without price." And, besides, the testimony shows that no one ever called in question the power of the meeting to authorize the sale until after the result of the vote upon the question had been ascertained. Conceding that this property was impressed with a trust, we think the trust has been executed in accordance with the expressed will of the *cestuis que trust*. There is no force in the objection that the meeting was not properly called. Notice was sent out, in the usual way, by postal card, by request of one of the trustees, and the fact, if it be a fact, that the object of the the meeting was not expressed, cannot invalidate what was there done.

We need not now determine whether or not the grantees of the premises in question will have the right to remove therefrom the bodies now buried there without the consent

of relatives or friends, as that question is not now before us. Nor need we decide the question urged by appellants, that the court erred in setting aside the judgment rendered in a former trial of this action, as the judgment, in our view of of the case, must be reversed on the merits.

The judgment is reversed, and the cause dismissed at the cost of the respondents.

Scott, Hoyt, Dunbar and Stiles, JJ., concur.