# Staunton.

## Scholz v. Standard Accident Insurance Company.

September 23, 1926.

Absent, West, J.

1. Exceptions, Bill of—*Notice to the Opposite Party or his Attorney— Validity of Bill of Exceptions—Section 6252 of the Code of 1919, as Amended by Act of 1924, Page 62.*—Section 6252 of the Code of 1919, as amended by act of 1924, page 62, providing that, before the court or judge in vacation shall sign a bill of exceptions, it shall appear in writing that the opposite party or his attorney has had reasonable notice of the time and place at which the bill of exceptions was to be tendered to the court or judge, is an important statute, and compliance with it is necessary to the validity of the bill of exceptions.

2. Exceptions, Bill of—*Notice to the Opposite Party or His Attorney— How Compliance with Section 6252 of the Code of 1919, as Amended by Acts of 1924, Page 62, Should be Shown.*—Properly, the bill of exceptions or the order granting it should show compliance with section 6252 of the Code of 1919, as amended by Acts 1924, page 62, as to notice to the opposite party or his attorney, but the statute is silent on the subject and the practice in this respect has not been uniform. But it is plain that what was to "appear in writing" was to appear to the trial court or judge who was to act on it. The manner of showing this is a matter of form.

3. Exceptions, Bill of—*Notice to the Opposite Party or His Attorney— How Compliance with Section 6252 of the Code of 1919, as Amended by Acts of 1924, Page 62, Should be Shown—Case at Bar.*—In the instant case it appeared from the affidavit of the trial judge, which was in no way questioned, that the notice of the time and place of the tendering of the bill of exceptions, required by section 6252 of the Code of 1919, as amended by Acts of 1924, page 62, to be given the opposite party or his attorney, was given; that opposing counsel was present and the propriety of signing the bill of exceptions was decided on its merits.

*Held:* That to ignore these facts because not stated in the bill of exceptions, and the notice and return thereon were not formally made parts of the record, would be to sacrifice substance to form, which is forbidden by section 6331 of the Code of 1919.

4. Exceptions, Bill of—*Notice to Opposite Party or His Attorney—How Compliance with Section 6252 of the Code of 1919, as Amended by Acts of 1924, Page 62, Should be Shown.*—Section 6252 of the Code of 1919, as amended by acts of 1924, page 62, does not require the notice of the time and place of tendering a bill of exceptions to the court or judge, to be made a part of the record, but simply that it shall be made to "appear in writing" to the trial court or judge that the notice was given. If the notice was in fact given, that fact may be established in some satisfactory manner, as by certificate of the trial judge, or by affidavit.

5. Exceptions, Bill of—*Notice to Opposite Party or His Attorney—Section 6252 of the Code of 1919, as Amended by Acts of 1924, Page 62, is to be Construed with Other Sections of the Code—Case at Bar.*—Section 6252 of the Code of 1919, as amended by Acts of 1924, page 62, providing for notice to the opposite party or his attorney of the time and place of tendering a bill of exceptions to the judge or court, is a section of the Code of 1919 which was a general revision of the entire statute law of the State, and must be construed along with other sections of the Code so as to make them harmonize, if possible. The provision as to giving the notice is substantial and material and cannot be minimized or ignored, but the manner of evidencing this fact, or of making up the record for appeal, is purely formal. In the instant case it would violate the spirit if not the letter of section 6331 of the Code of 1919, forbidding reversals where it appears that the parties have had a fair trial on the merits and substantial justice has been reached, to reverse the judgment for failure to comply with section 6252 of the Code of 1919, as amended by Acts of 1924, page 62, where it appeared from an affidavit of the judge that the notice required by that act had been given.

6. Insurance—*Provisions in Policy in Conflict with the Statutory Provision.*—Where a policy of insurance contains provisions in conflict with statutory provisions of the place of contract, it is well settled that the statute will prevail.

7. Insurance—*Rates or Classification of Risk Filed with the Commissioner of Insurance—Compliance with Section 4315 of the Code of 1919—Paragraph A of the Standard Provisions.*—Paragraph A of "Standard Provisions" regarding filing with State officials of the premium rates and classification of risks is a full compliance with section 4315 of the Code of 1919, and in the instant case, an action on an accident policy, the policy is to be construed according to its terms, and "the premium rates and classification of risks mentioned in this policy shall mean only such as have been last filed by the company in accordance with such law.

8. Insurance—*Renewal of Policy—Date of Expiration Given—Time of Payment of Premium—Case at Bar.*—In the instant case, an action on an accident policy, the renewal receipt continued the policy in

force from May 6, 1923, to May 6, 1924. The insured died June 25, 1924. The plaintiff claimed that the renewal premium was not paid until July 10, 1923, and that such payment continued the policy in force from July 10, 1923, to July 10, 1924. The policy provided that any premium paid to the company for any period not covered by the policy would be returned upon request. If an excess premium was paid that did not render the policy void but subjected the company to a penalty under section 4320 of the Code of 1919. The renewal receipt and not the amount of the premium paid fixed the duration of the risk.

*Held:* That the policy had expired at the time of the death of the insured.

9. INSURANCE—*Renewal of Policy—Date of Expiration Given—Time of Payment of Premium—Case at Bar.*—Reading a policy for accident insurance and renewal receipt therefor together as component parts of the contract, it appeared that the insurance company contracted that, in consideration of $150, the policy "was continued in force for twelve months from noon, standard time, of the 6th day of May, 1923, to noon, standard time of the 6th day of May, 1924," and that the parties agreed that any premium paid for any period not covered by the policy should be refunded by the company upon request.

*Held:* That the parties might validly so agree and their contract was not for any extension of the risk beyond May 6, 1924, but for a refund of the excess of premium, if any.

10. WITNESSES—*Transactions with Deceased Persons—Corroboration Under Section 6209 of the Code of 1919—Insurance Agents.*—A mere agent of an insurance company, having no interest in the controversy, although the insured is dead, was a competent witness at common law and does not require corroboration under section 6209 of the Code of 1919 as to transactions between the agent and the insured in regard to the policy sued upon.

11. INSURANCE—*Renewal of Policy—Agent Undertaking to Carry Insured—Case at Bar.*—In the instant case, an action on an accident policy, the renewal receipt continued the policy in force from May 6, 1923, to May 6, 1924. The insured died June 25, 1924. The plaintiff claimed that the renewal premium was not paid until July 10, 1923, and that such payment continued the policy in force from July 10, 1923, to July 10, 1924. Defendant company claimed that the policy was in force from May 6, 1923. The agent of defendant, through whom the policy was taken out, testified that he had agreed with insured to carry the policy for him and give him credit and that the company charged his firm with the amount of the renewal receipt and that insured became liable to his firm for the amount. The renewal receipt was not delivered to insured but the agent testified that he would have delivered it to him if he had asked for it.

*Held:* That if insured had died between May 6, 1923, and July 10, 1923, under this evidence the company would have been liable and therefore the policy had expired at the time insured died, June 25, 1924.

12. Insurance—*Strict Construction.*—Insurance policies are prepared by the insurers, and in cases of doubt or uncertainty are construed most strongly against them.

13. Insurance—*Renewal of Policy—Authority of Agents—Countersigning Payment of Premiums.*—Agents of the insurer were provided with policies which they could issue without referring them back to the company, and were also provided with renewal receipts duly executed by the company, and were authorized to collect the amounts called for by the receipts and to countersign the same. The countersigning was necessary to insure their authenticity, but if the money was actually and duly paid to the agents, the insurer was liable in like manner as if the receipt had been duly countersigned. The delivery to the agents of the renewal receipts, duly executed, was sufficient evidence of the consent of the company to the renewal of the policy, and if the premium was paid by or for the assured that was a sufficient compliance with the provisions of the policy that "this policy may be renewed with the consent of the company, and by the payment of the premium."

14. Insurance—*Payment of Premium—Agent Carrying Insured—Credit by Agent.*—Where not forbidden by the policy, an agent may make a valid contract with an assured to carry the risk for him for a designated time.

15. Insurance—*Witnesses—Opinion Evidence—Cross-Examination—Witness Asked as to Whether the Insurance Company was Liable.*—In the instant case, an action on an insurance policy where the question at issue was the period covered by the policy, the agent who negotiated the policy was asked on re-examination the following question: "If during the time that you agreed to give him credit, Mr. Scholz had died, would he not, under your agreement with him, have been protected, or would he, or not, have been protected?" To which he answered yes.

*Held:* That while this question if allowed on the examination in chief would have necessitated a reversal as asking the opinion of the witness, yet it was proper on re-examination, where the question had been brought up in cross-examination, and the answer was a mere reiteration of what had been elicited on cross-examination.

16. Witnesses—*Cross-Examination—Re-Examination.*—A party who has voluntarily brought out evidence on the cross-examination of a witness, will not be heard to object to the same evidence when brought out by his adversary on a re-examination of the same witness.

17. Insurance—*Witness—Custom of Insurance Agent.*—In the instant case, an action on an insurance policy where the question at issue was the period covered by the policy, the agent who negotiated the policy was asked the following question: "State whether or not in a great

many instances you carry insurance for your customers for two or three or more months, during all of which time under your agreement and under authority from the company they are protected?" To which he answered yes.

*Held:* That so far as the question asked about authority from the company it was a legitimate question, and so far as it enquired about the custom of the office of the witness it had been fully brought out by the plaintiff on the cross-examination of the witness.

Error to a judgment of the Law and Chancery Court of the city of Roanoke, in a proceeding by motion for a judgment for money. Judgment for defendant. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*A. P. Staples, Jr., A. B. Hunt* and *T. W. Messick,* for the plaintiff in error.

*H. M. Fox,* for the defendant in error.

Burks, J., delivered the opinion of the court.

[1, 2] There is a preliminary motion to dismiss this writ of error because of a failure to comply with section 6252 of the Code, as amended by Acts of 1924, p. 62, declaring: "But before the court or judge in vacation shall sign any bill of exceptions so tendered, it shall appear in writing that the opposite party or his attorney has had reasonable notice of the time and place at which said bill of exception is to be tendered to the court or judge."

The statute is an important one, and compliance with it is necessary to the validity of the bill of exception; but how must such compliance be evidenced? Properly, the bill of exception or the order granting it should show it, but the practice in this respect has not been uniform. The statute is silent on the subject, but it is plain that what was to "appear in writing" was to appear to the

trial court or judge who was to act on it.    The manner of showing this is a matter of form.

[3,4] If the notice was not in fact given, the act of signing the bills of exception was a nullity, and they cannot be considered.    It must in some way be made to appear affirmatively that the notice was given, or was waived, but the manner of showing this fact is not pointed out by the statute.    In the case of appeal to this court, where the matter involved is merely pecuniary, it must affirmatively appear that the amount in controversy is within the jurisdiction of the court, but it has been held that where this does not otherwise appear from the record, it may be shown by affidavits filed in this court.    *Lamb* v. *Thompson*, 112 Va. 134, 70 S. E. 507.    By analogy the same rule should be applied to the notice required by the statute.    In the instant case it appears from the affidavit of the trial judge, which is in no way questioned, that the notice was given, opposing counsel was present, and the propriety of signing the bills of exception was decided on its merits; and yet we are asked to ignore these facts because not stated in the bills of exception, or the notice and the return thereon were not formally made parts of the record.    This would be a sacrifice of substance to form, which is forbidden by section 6331 of the Code.    The statute does not require the notice to be made a part of the record, but simply that it shall be made to "appear in writing" to the trial court or judge that the notice was given.    If the notice was in fact given, that fact may be established in some satisfactory manner, as by certificate of the trial judge, or by affidavit.

There is a strong array of authority to show that the giving of a notice of this kind is jurisdictional, and that the judge of the trial court is without power to sign the bill, unless it *appears from the record* that the notice has

been given.   *Rareburg* v. *Roach*, 18 Kan. 592; *Atkinson, &c., R. Co.* v. *Ditmats* (Kan. App.), 42 Pac. 933; *State* v. *Hirschey*, 5 Wash. 326, 31 Pac. 871; *Van Why* v. *So. Pac. R. Co.*, 5 Utah 15, 86 Pac. 485; *State* v. *Gowith*, 19 Mont. 48, 47 Pac. 207; *State* v. *Howard*, 15 Wash. 425, 46 Pac. 650; *Farner* v. *Allen*, 18 N. M. 237, 135 Pac. 1173.

[5]  Our statute, however, is a section of the Code of 1919, which was a general revision of the entire statute law of the State, and must be construed along with other sections of the Code so as to make them harmonize, if possible.   The provision as to giving the notice is substantial and material and cannot be minimized or ignored, but the manner of evidencing this fact, or of making up the record for appeal, is purely formal.

The revisors tell us that one of the principal objects of the revision was to secure to every litigant a fair trial on the merits of his case, and as far as possible to subordinate form to substance.   In this spirit they inserted in section 6331 the provision that no judgment should be arrested or reversed for any "defect, imperfection or omission in the record, or for any error committed on the trial where it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached."   In the revisors' note to this section it is said:   "It is intended to render it practically impossible for a case to be reversed on any mere technicality, and to allow all judgments to stand when fairly rendered on the merits, if substantial justice has been reached."

It would violate the spirit, if not the letter, of this statute to reverse the judgment in the instant case for the formal defect complained of.

This was an action on an accident insurance policy, issued in 1919, and kept in force by subsequent renewals.

A copy of the policy is filed with the notice of motion for a judgment. The plaintiff also filed a bill of particulars, of which the following is a copy:

"Plaintiff will claim that the said accident insurance policy, a copy of which is filed with the notice of motion for judgment, was continued in force for twelve months from the 10th day of July, 1923, by virtue of a certain renewal agreement, a copy of which is hereto attached.

"COPY OF RENEWAL AGREEMENT.

"Personal Accident and Health Renewal.

"Standard Accident Insurance Company
*of Detroit, Michigan.*

"In consideration of a premium of one hundred fifty and 00–100 dollars, Policy No. 1004 4565 is continued in force for twelve months from noon, standard time, of the 6th day of May, 1923, to noon, standard time, of the 6th day of May, 1924.

"Issued to Henry Scholz.

"This renewal is issued subject to all of the agreements, conditions and provisions of the said policy, as well as those of any supplementary agreement attached to said policy.

"(Not valid unless countersigned by the agent.)
"No. 876253 C.

"Lem W. Bowden,
"President.

"Charles C. Powen,
"Secretary.

"Countersigned at Roanoke, Virginia, this 10th day of July, 1923.

"Wellford & Smith,
"By (*Signed*) Wellford, Agent."

(Written across the above in large red letters):

## "VALUABLE DO NOT DESTROY."

It will be observed that the renewal receipt continues the policy in force from May 6, 1923, to May 6, 1924. The insured died June 25, 1924. The plaintiff claimed that the renewal premium was not paid until July 10, 1923, and that such payment continued the policy in force from July 10, 1923, to July 10, 1924. The insurance company defended on the grounds, (1) that the policy had expired at the time of the death of the assured, and (2) that the death of the assured did not result from bodily injuries effected directly, exclusively and independently of all other causes, through accidental means, which was the injury insured against.

The policy contained the following *"Standard Provisions:"*

"A. (1) This policy includes endorsements and attached paper, if any, and contains the entire contract of insurance except as it may be modified by the company's classification of risks and premium rates in the event that the insured is injured after having changed his occupation so classified, except ordinary duties about his residence or while engaged in recreation, in which event the company will pay only such portion of the indemnities provided in the policy as the premium would have purchased at the rate but within the limits so fixed by the company for such more hazardous occupation

"If the law of the State in which the insured resides at the time this policy is issued requires that prior to its issue a statement of the premium rates and classification of risks pertaining to it shall be filed with the State official having supervision of insurance in such State, then the premium rates and classification of risk mentioned

in this policy shall mean only such as have been last filed by the company in accordance with such law, but if such filing is not required by such law, then they shall mean the company's premium rates and classification of risks last made effective by it in such State prior to the occurrence of the loss for which the company is liable.

"B.   (2) No statement made by the applicant for insurance not included herein shall avoid the policy or be used in any legal proceeding hereunder.   No agent has authority to change this policy or to waive any of its provisions.   No change in this policy shall be valid unless approved by an executive officer of the company and such approval be endorsed hereon.

"C.   (3) If default be made in the payment of the agreed premium for this policy, the subsequent acceptance of a premium by the company or by any of its duly authorized agents shall reinstate the policy, but only to cover accidental injury thereafter sustained and such sickness as may begin more than ten days after the date of such acceptance.

"Q.   (20) The insurance under this policy shall not cover any person under the age of eighteen years nor over the age of sixty-five years.   Any premium paid to the Company for any period not covered by this policy will be returned upon request."

The policy also provided that "this policy may be *renewed* with the consent of the company, and by the payment of the premium, subject, however, to its conditions and limitations."

About two weeks prior to May 1, 1923, the company sent to its agents at Roanoke, Wellford & Smith, the renewal receipt hereinbefore copied preparatory to the renewal of the policy on the date of its expiration, to-wit, May 6, 1923, but it was not so renewed.   About a week or ten days after May 6, 1923, Wellford, of the firm of

Wellford & Smith, applied to the insured to renew his policy, and he agreed to renew it in about thirty days, and Wellford agreed that his firm would carry the policy for that period. The premium on the policy had been increased ten dollars since the last renewal and the insured wished some explanation of this fact. Wellford undertook to make the explanation, and on June 22, 1923, sent the renewal receipt to the company, together with a similar receipt for another party, and, after referring to the increase in the premium, said: Please look into this and see if any error has not been made in figuring the premiums on these policies. If so, kindly correct the premiums, if not, please return the renewals, explaining the advance in premiums."

On June 26, 1923, the company returned the renewal receipts to Wellford & Smith, explaining the increase of the premiums and saying: "We trust that you will have no difficulty in placing the renewals in the hands of the assured." On July 10, 1923, the insured paid the premium of $150.00 to Wellford & Smith, and Wellford says he thinks he then delivered to him the renewal receipt aforesaid. No question is raised about the payment thereafter of the amount of the premium to the company by Wellford & Smith.

The action being on contract, the plaintiff's right of recovery is dependent upon the proper interpretation of the contract evidenced by the policy and the renewal receipt aforesaid.

[6] Where a policy of insurance contains provisions in conflict with statutory provisions of the place of contract, it is well settled that the statute will prevail. *Orient Ins. Co.* v. *Daggs,* 172 U. S. 557, 19 S. Ct. 281, 43 L. Ed. 552; *Whitfield* v. *Aetna Ins. Co.,* 205 U. S. 489, 27 S. Ct. 578, 51 L. Ed. 895.

[7] An effort was made in the argument to show that

the policy in the instant case does not comply with the provisions of section 4315 of the Code, quoted from in the margin,* but we are of opinion that paragraph A of the "Standard Provisions" hereinbefore quoted is a full compliance with section 4315, and that the policy is to be construed according to its terms, and that "the premium rates and classifications of risks mentioned in this policy shall mean only such as have been last filed by the company in accordance with such law."

It is not questioned that the rates charged in the renewal receipt accord with the list "last filed by the company with the State Corporation Commission," but it is insisted that there was no insurance in force from May 6, 1923, till July 10, 1923, when the premium was paid, and that the payment on that date was for insurance for one year from July 10, 1923. It is conceded, however, that if the policy was in force from May 6, 1923, to July 10, 1923, the plaintiff cannot recover.

[8] The record shows that the defendant made an honest effort to comply with the insurance laws of the State. The renewal receipt was sent to the agents two weeks before May 1, 1923, with a view to a prompt renewal for one year of the policy on date of its expiration, and receipted for the premium for insurance for one year. But the company knew that those renewals were not always made on the dates of expiration, and that when made at later dates it would receive a greater sum for the premium than it was entitled to, hence it provided in its policy that "any premium paid to the company for any period not covered by this policy will be returned upon request."

---

* The Company's policy shall contain—
"(a) A provision that such policy, with a copy of the application therefor, if any, and of such papers as may be attached to or endorsed thereon, shall constitute the entire contract of insurance, except as the same *may be affected by any table of rates or classification of risks filed by the company with the Commissioner of Insurance.*

The parties to the contract were competent to enter into it, and could make any contract not forbidden by law or contrary to public policy. The contract fixed the date of its termination at "noon, standard time, on the 6th day of May, 1924." If an excess premium was charged that did not render the policy void, but subjected the company to a penalty under section 4320 of the Code. Neither did the amount of the premium paid fix the duration of the risk. The renewal receipt fixed the duration of the risk. The policy fixed the rate to be charged therefor, and this accorded with the statute. Conceding that the premium exceded the amount which might be lawfully charged, the effect was not to extend the duration of the risk, but to require the company to refund the excess under the terms of the policy which stipulated that "any premium paid to the company for any period not covered by this policy will be returned upon request." We know of no statute in this State which is inconsistent with and prevails over the terms of this contract. Neither the policy nor any statute provided that the policy should continue in force for a year from the payment of the premium, but the contract evidenced by the renewal receipt fixed the date of expiration, and the policy provided that any excess of premium should be refunded.

[9] This was not a reinstated policy under clause C of the "Standard Provisions," but an extension or renewal of the original policy, and reading the policy and renewal receipt together, as component parts of the contract, we find that the company contracted that, in consideration of $150, the policy "was continued in force for twelve months from noon, standard time, of the 6th day of May, 1923, to noon, standard time of the 6th day of May, 1924," and that the parties agreed that any premium paid for any period not covered by the policy should

be refunded by the company, upon request. We can see no reason why the parties might not validly so agree. Their contract was not for any extension of the risk beyond May 6, 1924, but for a refund of the excess premium, if any.

In the case of *Stout* v. *Missouri Casualty Co.* (St. Louis Ct. of App.), 179 S. W. 993, and *Fallis* v. *Massachusetts B. & Ins. Co.*, 210 Mo. App. 579, 243 S. W. 217, so much relied on by the plaintiff in error, it does not appear, from the reports of those cases, that the policies contained the provision for refunding excess premiums contained in the policy in the instant case. They stress the meaning of "monthly premiums" for a month's insurance, and other language not found in the policy in the instant case.

As we have hereinbefore stated, under the terms of the policy, if a premuim was paid for any period not covered by the policy, the effect was not to extend the period of the risk, but to render the company liable for a refund of the excess. In the instant case, the period of the risk fixed by the renewal receipt was from May 6, 1923, till May 6, 1924, and if the policy was not in force between May 6, 1923, and July 10, 1923, that time was "a period not covered by this policy" and if an excess premium was charged for the period stipulated for, the effect was to render the company liable to refund the excess, and not to extend the period of the risk. Such was the contract of the parties.

If, however, we are wrong in our construction of the contract, was there any excess premium charged? This depends upon whether the policy of the insured was in effect from May 6, 1923, till July 10, 1923. If it was, then the rate charged and received was not excessive. The only evidence on this subject is the testimony of Warren Wellford and the correspondence between his

firm and the defendant company, and unless there is contradiction in this evidence, there is no conflict in the evidence on the subject.

[10] Wellford was a mere agent for the defendant company, had no interest in the controversy, and, although the assured is dead, Wellford was a competent witness at common law and does not require corroboration under section 6209 of the Code. *Robertson* v. *Atlantic, &c., Realty Co.*, 129 Va. 494, 106 S. E. 521; *Epes* v. *Hardaway*, 135 Va. 80, 115 S. E. 712.

Wellford testified that his firm of Wellford & Smith received the renewal receipt of the insured prior to May 1, 1923; that about a week or ten days after May 6, 1923, he saw Scholz, the insured, and explained to him why the premium was $150, instead of $140, as theretofore, and Scholz said that he would accept the renewal and pay for it "in about thirty days or about the first of the month" of July, and Wellford agreed to carry the risk for him for that time. Wellford agreed "to reinstate that policy and to give him credit that he asked for. He wanted to retain this particular policy and I told him I would carry it and give him credit." A new policy and such as was then being issued would have cost him $160. Wellford testified that the company charged his firm with the amount of the receipt; that Scholz became liable to the firm for the amount, and the firm to the company; that he did not at the time surrender the renewal to Scholz because he did not ask for it; that they had a "number of customers that rarely ever did get the receipts;" that if Scholz had died before July 10, "I would have had to explain to the company that I was carrying him and I would have settled with the company for his premiums at settling time." On cross-examination by the plaintiff he testified in part as follows:

"Q. If you return the receipt to the company; you

wouldn't do that if you had extended a man credit, you
would look to him for payment?

"A. No, sir; we would have paid that for him to the
company if we were carrying him.

"Q. That is your invariable custom, that when the
premium is not paid, in order to get credit with your
company you send that renewal receipt back and they
credit you up with the renewal receipt which they have
charged you with?

"A. Yes, sir; for those we are not carrying ourselves.

"Q. If you were carrying it yourself, it would never
go back to the company?

"A. No, sir; we would carry it."

The witness then testified that the renewal receipt
had never been out of his custody from the time it was
received until payment was made on July 10, 1923.
The renewal receipt was then presented to the witness
bearing the endorsement of the home office of the com-
pany, "Received per Acc. & H. Department June 25,
1923." This was not satisfactorily explained at the time,
but the next morning, when the examination of the wit-
ness was resumed, he stated that he had looked up his
correspondence on the subject, and found that the re-
ceipt had been sent to the home office for an *explanation*
of why the premium had been raised. The correspond-
ence consisted of a letter from Wellford & Smith to the
home office of the company, dated June 22, 1923, and of
the reply thereto.   The letter of Wellford & Smith en-
closed the Scholz renewal and one other renewal.   After
describing the renewal receipts, it is said:   "Please look
into this and see if any error has not been committed in
figuring the premiums on these notices.   If so, kindly
correct the premiums; if not, please return the renewals,
explaining the advance in premiums."   No credit was

asked. The reply from Detroit, Mich., dated June 26, 1923, gave the explanation asked and returned the receipts. In concluding the reply it is said: "We trust that you will have no difficulty in placing the renewals in the hands of the assured." The letter of Wellford & Smith did not mention the fact that they were carrying the assured, nor did it contain anything to which the words quoted from the company's letter was a reply.

Wellford further testified as follows:

"Q. State whether or not from the time you had the arrangement with Mr. Scholz to give him credit for this renewal premium, if at any time he had demanded of you the certificate, whether or not, under your agreement with him, you would have delivered the certificate or procured it and delivered it to him, whether premium had then been paid by Mr. Scholz or not?

"A. Yes, sir; I would have delivered it to Mr. Scholz at the time I called on him if he had demanded it, or any other time, because I had extended him credit and I was responsible for the premium."

[11] If Scholz had been accidently killed prior to July 10, 1923, would a jury, upon the foregoing evidence, have been justified in finding the defendant liable on the policy sued on? We think it would.

[12, 13] Insurance policies are prepared by the insurers, and in cases of doubt or uncertainty are construed most strongly against them. Wellford & Smith were agents of the insurer; were provided with policies which they could issue without referring them back to the company, and were also provided with renewal receipts duly executed by the company, and were authorized to collect the amounts called for by the receipts and to countersign the same. The countersigning was necessary to insure their authenticity, but if the money was actually and duly paid to the agents of the company we

do not doubt the liability of the insurer in like manner as if the receipt had been duly countersigned. The delivery to the agents of the renewal receipts, duly executed, was sufficient evidence of the consent of the company to the renewal of the policy, and if the premium was paid by or for the assured that was a sufficient compliance with the provisions of the policy that "this policy may be *renewed* with the consent of the company, and by the payment of the premium."

The policy was issued in consideration of a fixed premium and it could make no difference to the company, if the premium were in fact paid, whether it was paid by the assured or by the agent. The policy did not provide that it should not be effective until the premium was actually paid to the company, as some policies do, and the agent was in no default in making payment to the company. The extension of credit, in the manner indicated, did not violate any express provisions of the policy.

A number of cases hold that the cancellation of a debt of the agent to the assured is not a payment within the meaning of the law, where the amount is not paid by the agent to the company at the time the premium should have been paid. *Ferebee* v. *North Car., &c., Ins. Co.*, 68 N. C. 11; *Sullivan* v. *Germania L. Ins. Co.*, 15 Mont. 532, 39 Pac. 742, Note L. R. A. 1915A, 686. But this is not such a case. Here there was a continuing personal obligation on the part of the assured to pay the premium to the agent, which was discharged by the assured on July 10, 1923.

In *Wooddy* v. *Old Dom. Ins. Co.*, 31 Gratt. (72 Va.) 362, 31 Am. Rep. 732, a policy of fire insurance on a building should have been issued, according to the agreement between the agent of the company and the owner of the building, on April 16, and the building was

destroyed by fire in the early morning of the next day, April 17. "No policy was ever issued to the appellant by Rowzie or by the company, nor was the premium ever paid by the appellant unless the tender aforesaid, coupled with the agreement between the appellant and the company's agent (Rowzie) amounted to a payment. Rowzie, it seems, has never had any settlement of accounts with the company. It was his duty, according to the proofs, to make daily and monthly reports of his transactions as agent to his principal." The circumstances relating to the tender of the premium hereinbefore referred to were that the assured "pulled out his pocket book and took out the money" to pay the premium of $12.50 when the agent declined to receive it, saying he owed the owner more than that for rent and would credit him by that amount. This was held to be a payment of the premium and the company liable. In the course of the opinion it is said:

"The appellant took the money from his pocket and offered it to Rowzie who declined to take it, saying in terms, '*I have in my hands* money belonging to you for the rent, and will credit you by that amount.' It seems to me that it would be extremely technical to hold that this was not a payment, when, if instead of retaining the money, which he says he had in his hands belonging to the appellant, he had paid it over to him with one hand and taken it back from him with the other, the law deemed that there would have been payment. In the latter case, the money paid would have become at once the money of the company in the hands of its agent, and so, I think, the money retained by the agent under the arrangement made became in like manner the money of the company, the greater part of it, in fact ($9.00), was already in the hands of the company; for, according to Rowzie's statement (and it is not contradicted) the company owed him that amount, balance on account.

*   *   *   *   *   *   *   *   *

"In *Bouton* v. *Am. Mutual Life Ins. Co.*, 25 Conn. R. 542, it was decided that an agreement made in good faith between an insurance agent having authority to receive an insurance premium, and the insured, that the agent shall become personally responsible to his principals for the amount of such premium,. and the insured his personal debtor therefor, constitutes a payment of the premium as between the insured and the insurance company. The same principle was affirmed in *Sheldon* v. *Conn. Mutual Life Ins. Co.*, 25 Conn. R. 207 [65 Am. Dec. 565]." To the same effect see *Hallock* v. *Commercial Ins. Co.*, 2 Dutcher (N. J.) 268.

In *Wytheville Ins. & B. Co.* v. *Teiger*, 90 Va. 277, 280, 18 S. E. 195, 196, it is said in an opinion by Lewis, P.: "Moreover, it is fair to infer from the fact of giving credit in the present case, and the custom of these agents, to remit to the company only once or twice a, month, and sometimes not oftener than once in two months; that they were in the habit of delivering policies on credit, and this was known and assented to by the company. *Labarno Ins. Co.* v. *Hoover*, 113 Pa. St. 591, 8A. 163, 57 Am. Rep. 511; *Ins. Co.* v. *Norton*, 96 U. S. 234, 24 L. Ed. 689.

"It would seem, also, from what was brought out in the cross-examination of the vice-president of the company as a witness in the case, although he does not say so in so many words, that the practice of the company was to charge its agents personally with the premiums on policies sent to them. He says they still owe for a number of policies, some of which have expired. And if they were, in fact, charged with the premiums on the plaintiff's policy when the policy was signed, then, as between the plaintiff and the company, the premium was paid when the policy was delivered; for *the rule is*

*well settled that where the agent gives credit and the amount is charged to him by the insurer, the transaction is equivalent to a payment.*  *Miller* v. *Life Ins. Co.*, 12 Wall. 285, 20 L. Ed. 398; *White* v. *Conn. Ins. Co.*, 120 Mass. 330; *Train* v. *Holland Ins. Co.*, 62 N. Y. 598; *Bang* v. *Farmville Ins. Co.*, 1 Hughes 290 [Fed. Cas. No. 838]. (Italics supplied.)

In *Homestead Ins. Co.* v. *Ison*, 110 Va. 18, 65 S. E. 463, the court thus states the facts and its conclusions thereon as to the payment of the premium: "It is contended by the insurance company that the policy never became effective, because the premium was never paid.

"This position is not sound.  The record shows that the Appalachia Insurance Agency, composed of Brooks & Sparks, were general agents of the defendant company, with blank policies signed by the president and secretary of the company in their hands to be delivered by them to applicants for insurance.  They had full authority to deliver policies, collect premiums and make rates.  The policy in this case receipts the payment of the premium, forty-eight dollars, and recites that it was issued in consideration of that premium; and further shows on its face that as between the company and the Appalachia Agency the premium in question was considered as fully paid.  The plaintiff testified that when the agent delivered the policy to him he offered to pay him the whole amount in money, and was told that if he would pay two dollars and some potatoes, and settle an account he had against the agent on his books it would be sufficient, and that he (the agent) would trade out the balance with him, or call on him later if he needed more money.  The agent says that he asked the plaintiff for five dollars; that the latter gave him two-and-a-half dollars, and said he was going to Kentucky to see about some money and would settle in full when he re-

turned; and he told him that would be all right and delivered the policy.

"The defendant was bound, in either view of the transaction. The company having given its agent full power to collect the premium, and having treated the premium as paid, cannot now call in question the transaction of its agent in extending credit to the insured for a part of the premium. The policy in this case contains no condition that it shall not be effective unless the premium be paid, and nothing to show that the payment of the premium in money is a prerequisite to the taking effect of the contract.

"An agent who has power to countersign and deliver policies and who is responsible to the company for the premiums and their collection on all policies issued by him, binds the company by an agreement to extend credit to the insured. A valid payment may be made in other ways than in cash, if there has been an assent thereto by the insurer or its agent. 19 Cyc. 605, 606."

The court then quotes from and approves the opinions in *Wooddy* v. *Old Dom. Ins. Co., supra,* and *Wytheville Ins. & B. Co.* v. *Teiger, supra.*

In *Squiers* v. *Hanover Fire Ins. Co.,* 162 N. Y. 552, 57 N. E. 93, 76 Am. St. Rep. 349, it was held that where insurance agents authorized 'to countersign, issue and renew policies of insurance' agree orally to continue an existing contract of insurance and issue a renewal of policy therefor, the insurer is bound, although credit was given for renewed premium. In the course of the opinion it was said: "The oral contract is the ordinary and usual agreement which an insurance agent makes on the eve of the policy expiring that he will renew it. The question in this case is not whether the agent can enter into a parol contract of insurance that will bind the principal, but rather having agreed orally to continue

an existing contract of insurance and issue a renewal or policy therefor the company is bound thereby.

"This court considered the question in *Ellis* v. *Albany City Fire Ins. Co.*, 50 N. Y. 402, 10 Am. Rep. 495, and held the parol contract valid. In a later case (*Angell* v. *Hartford Fire Ins. Co.*, 59 N. Y. 171, 17 Am. Rep. 322) the authority cited was followed, and it was further held that the payment of the premium at the time of the oral agreement is not necessary to make the contract binding on the company; if a credit be given by the agent it is equally obligatory. *Trustees, &c.* v. *Brooklyn Fire Ins. Co.*, 19 N. Y. 305; *Audubon* v. *Excelsior Ins. Co.*, 27 N. Y. 216."

In the instant case Wellford & Smith had the power to countersign, renew and issue the policy.

[14] Notwithstanding what is said in some of the cases quoted, it is not necessary to decide, and we go no further than to hold that, where not forbidden by the policy, an agent may make a valid contract with an assured to carry the risk for him for a designated time.

Assignments of error three and four relate to the following questions propounded to the witness, Wellford, and his answers thereto:

"Q. I will ask it in this way. If during the time that you agreed to give him credit, Mr. Scholz had died, would he not, under your agreement with him, have been protected, or would he, or not, have been protected?"

"A. Yes, sir."

"Q. Now, Mr. Wellford, state whether or not in a great many instances you carry insurance for your customers for two or three or more months during all of which time under your agreement and under authority from the company they are protected?

"A. Yes, sir."

[15] Undoubtedly, the first question was an improper question to be asked on an examination in chief, and if it had been asked in chief would have necessitated a reversal of the case on the authority of *Life Ins. Co.* v. *Hairston*, 108 Va. 846, 62 S. E. 1057, 128 Am. St. Rep. 989. But it was not asked in chief, but on re-examination after a most protracted cross-examination by counsel for the plaintiff in which he went into all the circumstances relating to the renewal receipt, and asked the opinion of the witness on different phases of the case, amongst others: "Suppose he had died between those dates," and "If he had died in the meantime, he could not have a legal demand on the company without your aid, could he?"

None of these matters had been brought out on the examination in chief of the witness by counsel for defendant, and at an early stage of the cross-examination when the witness was asked: "Until he had the renewal receipt countersigned by you, it was not under its own terms, operative, was it?" Counsel for the defendant objected to the question and any answer thereto, but his objection was over-ruled, and the witness answered: "The policy, in my opinion, from the sixth day of May, from the time I called on Mr. Scholz in person, then I reinstated the policy back for him and I became then liable for the premium, I mean my firm did." On further cross-examination the witness testified in part as follows:

"Q. Now, then, if you became liable to the company, or your firm became liable to the company, for the premium, Mr. Scholz in turn was liable to you, and, of course, you gave him then his renewal certificate?

"A. I would have given it to him if he had asked for it. I don't know that I did give it to him. I don't think I did. but I would have done so if he had asked me for it.

"Q. Why didn't you mail it to him, if you extended him credit and wanted to make his policy operative, which could not be done until he had that renewal certificate countersigned by you.   Why didn't you do it?

"A. He didn't ask for it.

"Q. Suppose *he had died between those dates?*

"A. It would have been paid for.

"Q. By his own death?

"A. No, sir; it would have been paid for by the company's money.

"Q. What evidence did he have to that effect?

"A. He had the same evidence I had from him.   I told him I would extend him credit.   He had my word for it, and I had his word that he was going to pay it on that date.

\*        \*        \*        \*        \*        \*        \*        \*        \*

"Q. And not until that date, the 10th of July, did you give him this renewal certificate?

"A. No, sir.

"Q. If he had died in the meantime, he could not have had a legal demand on the company without your aid, could he?

"A. No, sir; I would have had to explain to the company that I was carrying him and I would have settled with the company for his premium at the settling date."

\*        \*        \*        \*        \*        \*        \*        \*        \*

"Q. If it (the receipt) was out of your possession, of course, Mr. Scholz would never have had any protection, would he?

"A. Do you claim he did not get the receipt?

"Q. I don't know.   I will ask you as a question of custom of your office, when you extend a man credit for renewal premiums, don't you then give him a renewal certificate?

"A. Not always.   We have a number of customers that rarely ever get the receipts.

"Q. Suppose it is not paid to you, what do you do then?

"A. Return it to the company.

"Q. Then you get credit when you return it to the company?

"A. Yes, sir.

"Q. If you return the receipt to the company—you wouldn't do that if you had extended a man credit, you would look to him for payment?

"A. No, sir; we would have that for him to the company, if we were carrying him.

"Q. That is your invariable custom; that when the premium is not paid, in order to get credit with your company you send that renewal receipt back and they credit you up with the renewal receipt which they have charged you with?

"A. Yes, sir; for those that we are not carrying ourselves.

"Q. If you were carrying it yourselves it would never go back to the company?

"A. No, sir; we would carry it."

The first question objected to, therefore, and the answer thereto was a mere reiteration of what had been elicited on the cross-examination.

The second question above objected to was also asked on re-examination after the cross-examination above recited, and after the witness had further testified on cross-examination as follows:

"Q. If it (renewal receipt) was out of your possession of course Mr. Scholz would never have had any protection, would he?

"A. Do you claim he did not get the receipt?

"Q. I don't know.  I will ask you as a question of custom of your office, when you extend a man credit for renewal premiums don't you then give him a renewal certificate?

"A. Not always.  We have a number of customers that rarely ever get the receipt, etc."

[16, 17] So far as the question asked about authority from the company it was a legitimate question, and so far as it enquired about the custom of the office of the witness it had been fully brought out by the plaintiff on the cross-examination of the witness.

A party who has voluntarily brought out evidence on the cross-examination of a witness, will not be heard to object to the same evidence when brought out by his adversary on a re-examination of the same witness.

In *Reliance Insurance Company* v. *Gulley*, 134 Va. 468, 114 S. E. 551, it was held: "Where a party objecting to evidence admitted had previously elicited the same evidence from the witness on cross-examination, the error, if any, is harmless.

In *Whitten* v. *McClelland*, 137 Va. 726, 120 S. E. 146, it is said: "It is well settled and obviously a sound general rule that an objection to evidence cannot be availed of by a party who has, at some other time during the trial, voluntarily elicited the same evidence, or has permitted it to be brought out by his adversary without objection. The rule finds its most frequent application in cases where the party making the objection afterwards introduces the same evidence, but it is properly and logically applicable in any case, regardless of the order of introduction, if the party who has brought out the evidence in question, or who has permitted it to be brought out, can be fairly held responsible for its presence in the case."

See also *Adams* v. *Ristine*, 138 Va. 273, 122 S. E. 126, 31 A. L. R. 1413.

As we are of the opinion that the policy was not in force at the time of the death of the assured, it is unnecessary to notice the other assignments of error.

The judgment of the trial court will be affirmed.

*Affirmed.*