## CENTROSOYUS–AMERICA, Inc., v. UNITED STATES.*

District Court, S. D. New York. November 20, 1928.

Harry D. Thirkield, of New York City, for libelant.

Charles H. Tuttle, U. S. Atty., of New York City (H. F. Birnbaum, Sp. Asst. U. S. Atty., of New York City, of counsel), for the United States.

KNOX, District Judge. This suit is brought to recover damages for water injury sustained by certain bales of flax carried by the steamship Natirar in the course of a voyage from Reval to New York in February, March, and April, 1926.

Prior to the time that the flax went aboard the vessel, the shipper, and the company, operating the Natirar, entered into a contract

*For opinion on rehearing, see 31 F.(2d) 610.

which, so far as is now material, was in the following terms:

"Reval, Febr. 10, 1926.

"1. It is this day mutually agreed between Messrs. Moore & McCormack, Copenhagen, owners of the Steamer S. S. 'Natirar' of 4859,2871 tons gross/net Register and carrying about 6500 dead-weight cargo, now at Reval and expected ready to load under this Charter about end of this week and Messrs. 'Sovtorgflot' Ltd., Estonian Dept. of Reval as Charterers.

"That the said vessel shall proceed to Reval or so near thereto, as she may safely get. * * *

"3. The vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist vessels in all situations, and also to deviate for the purpose of saving life and/or property."

"All other conditions and exceptions as per usual 'American Scantic Line' bill-of-lading."

When the merchandise was loaded, the agents for the ship issued about sixty-seven bills-of-lading against the same. With the exception of identification marks, all of the bills were in this language:

"Shipped in good order and well conditioned by Centrosoyus on board the good s/s called the 'Natirar' whereof Robbins is Master for this Voyage, now in the Port of Reval and bound for New York via other ports. To say B.280 11 No. 13-45 bales of flax IV cl.— 572 pds. 34 lbs.—9383 kilos W. b. 225264/ 15351 being marked and numbered as in the Margin and are to be delivered in the like good order and well conditioned at the aforesaid Port of New York (the. dangers & accidents of the seas excepted) unto Order or to assigns he or they paying Freight for the said Goods and all other conditions and exceptions as per Charter Party, dated Reval 10–2–26, with pr. cent primage and Average accustomed. In Witness whereof the Master or Purser of said ship hath affirmed to 1 org. 11 copies Bills of lading all of this Tenor and Date, the one of which being accomplished the others to stand void. Reval, the 16th day of February, 1926. Quality, measure, weight unknown."

In addition, the following notations were stamped on the margins of each of the bills:

"All clauses Conditions and Stipulations of Bill of Lading of American Scantic Line to be in force."

"Ship not responsible for marks and numbers."

The bill of lading of American Scantic Line, to which it is said reference was made in the shipping documents of the flax on board the Natirar, contains a deviation clause which is framed in the following terms: "The vessel shall have liberty to go on drydock with or without cargo on board, to call at any port or ports in or out or beyond the customary or advertised route for the purpose of bunkering, loading or discharging cargo, for this, a prior or subsequent voyage; to sail with or without pilots, to tow and to be towed, and to assist vessels in all places and in all situations and to take any measures deemed advisable by the master for the purpose of saving life and/or property. * * * *"

When the steamer arrived at New York, it was found that 34 bales of libelant's flax, stowed in No. 2 'tween decks, and 114 bales, stowed in No. 1 lower hold, were badly damaged by sea water.

Timely notice of the injury to the merchandise was given to the steamer's agents, and this action was promptly followed by the instant libel. The pleading asserts that respondent is responsible for the damages, not only for its failure to carry the goods safely, but also upon the ground that the ship was guilty of an unwarranted deviation in the course of her voyage. The latter claim grows out of the following circumstances:

The Natirar left Reval on February 17, 1926. The next day she anchored off Takhkana to await instructions from her owners. On the 19th, she received a wireless message from her operators at Copenhagen, which read: "Understand you waiting orders Dagerart therefore proceed south expect arrange loading Dangiz but Lenschat will wireless latest 7 p. m. Saturday if proceeding. Danzig or Copenhagen. Wire Lenschat confirmation."

The vessel got under way, and about 48 hours later received a message from Copenhagen directing her to anchor off Falsterbo for orders. She obeyed instructions, and while the record fails to indicate the nature of any further messages she may have received, the vessel is next found at the entrance to the Kiel Canal on the afternoon of February 22d. Two days thereafter she began loading cargo at Hamburg, and on March 1 the vessel proceeded toward Gothenberg, where she arrived the next day, having traveled 329 miles. She took on cargo at this port, and then, on March 3, broke ground for Boston, where she arrived three weeks later. About two days were spent in discharging freight at Boston, and the vessel then sailed for Norfolk, reaching there on March 29th. She remained at

the Virginia port until April 7th, when she sailed for New York, reaching here on the 9th. Until April 24th, she was occupied in discharging cargo, a part of which, consisting of kainit that had become wet, had to be blasted from her holds.

It is libelant's contention that the ship twice departed from the most expeditious route between Reval and New York, first by going to Hamburg and Gothenberg, and, second, by carrying the flax past the port of New York on the trip from Boston to Norfolk.

If the deviation clause contained in the charter party governs the rights of the parties, the case falls within the decision of the Court of Appeals for this circuit in the case of Smith v. United States Shipping Board Emergency Fleet Corporation, 26 F.(2d) 337. In that litigation the steamer West Aleta in making a voyage from Seattle, Wash., to Hamburg, Rotterdam, and Cardiff, was privileged " * * * to touch at any port or ports, in any rotation or order in, or out of, the customary route and to call at any port or ports more than once, unto the port of Rotterdam."

Instead of first stopping at Rotterdam, the vessel passed by that port with the intention of going to Hamburg and then returning to Rotterdam. Upon reaching a point about 100 miles beyond Rotterdam, she went aground, and became a total loss. At the suit of certain cargo owners against the owner of the vessel, she was held to have been guilty of a deviation, and her owners were required to pay for the loss of cargo.

Certain it is that the liberty possessed by the Natirar was no broader than that which had been accorded the West Aleta, and there is no doubt but that respondent's vessel carried libelant's goods beyond the port of New York. Hence, my first effort will be to ascertain if the deviation provision of the charter party, or that contained in the form of the bill of lading of American Scantic Line, is to rule the case.

 In my opinion, it is reasonably plain that the deviation clause of the charter party should fix the right of the parties. The body of the bill of lading, issued by the vessel's agents to the shipper of the goods, provided distinctly that "all other conditions and exceptions" (not specifically set forth therein) should be "as per Charter Party dated Reval 10-2-26." The charter, apparently, was available to inspection of the shippers, and they therefore had an opportunity to know the extent of the risk that was assumed with respect to the possible deviation of the

Natirar. So far as is disclosed by this record, the shippers never saw or knew, or, indeed, had any opportunity to learn, the nature of the provisions contained in the American Scantic Line form of lading. To the extent of their agreement to such provisions they were "buying a pig in a poke." They should not, in consequence, be held to a stipulation more onerous than the necessities of the case require. True enough, the stamp in the margin of the issued ladings stated that: "All clauses conditions of and stipulations of the bill of lading of American Scantic Line (were) to be in force."

 The effect of this clause, I think, should be limited to the incorporation within the contract of carriage of the subject-matter of such conditions and stipulations of the American Scantic Line as were not contained in, or dealt with in, the charter party or in the ladings actually issued to the shipper. Such construction is the only means by which an inconsistency between the two deviation clauses may be avoided. My conception of the law is that when the provisions contained in the written contracts are susceptible to inconsistent constructions, it is the duty of the court, when such procedure is reasonably possible, to avoid an interpretation which will bring them into conflict. Furthermore, a contract is to be construed more strictly against the party who framed its provisions than against him who accepted them. The adoption of either one of these principles, or of both of them, must result in the conclusion that the deviation clause contained in the charter party, and incorporated in the bills of lading delivered to the shippers, should be used in the measurement of the Natirar's right to make calls at the respective ports at which she stopped in the course of her voyage from Reval to New York. The correctness of this conclusion would seem also to be supported by the obvious meaning of the phraseology of the typewritten notation appearing at the end of the charter party, which is not that all "conditions and exceptions as per usual American Scantic Line bill-of-lading" should be applicable to the contract, but that "all *other* conditions and exceptions of the usual American Scantic Line bill-of-lading," not specifically covered by the charter, should become a part of the charter. The phraseology of the stamped notation on the bill of lading should be similarly interpreted.

 The recital in the bills of lading that the Natirar was bound from Reval to New York "via other ports" will not serve to broaden the deviation clause contained in the charter party. The proper meaning to be ascribed

to "via other ports" is that the parties contemplated that the Natirar might call at ports in the course of the ordinary and usual geographical route of passage between Reval and New York, and that, if she did so, the shippers and their assignees would not be heard to complain. But the words "via other ports" will not give sanction to the carriage of the goods to a port or ports beyond the destination at which they were to be delivered to the shippers or their assigns.

Respondent argues that the ninth clause of the charter party permitted the ship's owners to issue inconsistent bills of lading. The clause is in these terms: "The Captain to sign Bills-of-Lading at such rate of freight as presented without prejudice to this Charter Party, but should the freight by Bills of Lading amount to less than the total chartered freight the difference to be paid to the Captain in cash on signing Bills of Lading." So far as I am able to see, this clause has no bearing on the present state of facts; but in any event it gave the ship no right to include two deviation clauses in the bill of lading, and then, after the event of a deviation, to resort to whichever provision best suited its fancy.

Respondent further contends that libelant, not being a party to the charter, is in no position to claim the rights of the charterer. As is well known, the decision in the Caledonia, 157 U. S. 124, 15 S. Ct. 537, 39 L. Ed. 644, is to the effect that as between a shipper and shipowner the bills of lading only can be considered as the contract of carriage. And in this case, that document, which by direct reference to the charter party incorporated its deviation provision as a term of the contract of carriage, is sufficient expression of the agreement of the parties that the Natirar was not to go beyond the port of New York before undertaking to deliver libelant's goods. The vessel violated that agreement in proceeding to Norfolk before coming to New York, and her owners must abide by the result.

It is well, perhaps, to add to what has been said, that on no previous voyage of the Natirar had she gone to Reval or Hamburg, nor did she, in coming to the United States from foreign ports, customarily touch at Norfolk before arriving at New York. While she had done so on more than one previous occasion, she most often came to New York directly from Boston. Out of a total of 25 voyages made by vessels operated by Moore & McCormack, Inc., from Northern European ports to the United States, the ships made calls at Norfolk but 8 times. On these trips, Boston was twice included in the ships' itineraries. Once Norfolk was the first stop, Boston was the second, and New York the third. On the other voyage, the vessel first landed at Boston, proceeded to Norfolk, and then came to New York. It will thus be seen that the ships had no regular or customary run which might be said to have been within the contemplation of the parties.

In view of all that has been said, I do not consider it necessary to deal with the merits of the allegations of unseaworthiness of the Natirar, made by libelant, and with their denial by respondent. As a result of the deviation, the question of the seaworthiness of the Natirar has become academic.

Libelant may have a decree.