**FEDERAL SURETY CO. et al. v. A. BENT-LEY & SONS CO.**

**A. BENTLEY & SONS CO. v. FEDERAL SURETY CO. et al.**

Nos. 5599, 5604.

Circuit Court of Appeals, Sixth Circuit.

July 2, 1931.

Herman R. Miller, of Toledo, Ohio, for Federal Surety Co.

Ray Martin, of Toledo, Ohio (Marshall, Melhorn, Marlar & Martin, E. G. Davies, and Crary Davis, all of Toledo, Ohio, on the brief), for A. Bentley & Sons Co.

Before DENISON and MOORMAN, Circuit Judges, and SIMONS, District Judge.

SIMONS, District Judge.

While in form the appeals entitled as above are separate and independent, and have come to this court upon two separate records and two sets of briefs, and while some difficulty was experienced at the outset in apprehending the relationship to each other of the two causes, there being no apt explanation introductory to either set of briefs, it becomes clear upon consideration that the appeals seek to review the decision in the same case below, and are appeals from a single decree therein entered. They will therefore be treated together as appeal and cross-appeal, as in fact they are.

The Bentley & Sons Company was the plaintiff below. It filed its bill in equity against the Federal Surety Company and other defendants, seeking equitable relief in the way of accounting, marshaling and ascertainment of liens, impounding of funds, and injunction, and also money damages for breach of contract. The defendant filed a cross-petition in the nature of a counterclaim. The cause was by consent referred to a master, and, upon the return of the master's findings, exceptions were filed by each of the parties above named, and upon hearing thereon the decree, which is by each of the parties appealed from, was entered. No. 5599 is the appeal of the Surety Company, defendant below. No. 5604 is the plaintiff Bentley's cross-appeal. All claims by and against other parties to the suit have been settled in accordance with the decree of the trial court, and they are not here involved.

The original suit grew out of the construction of the United States Veterans' Bureau Hospital at Battle Creek, Mich., in 1923 and 1924. Bentley entered into a contract with the government to build the hospital, which consisted of some twenty-nine buildings. All were to be heated by a central steam heating plant, and the general contract price was approximately $2,000,000. The general contractors sublet the contract for the mechanical work, including plumbing and heating equipment, trench excavation, and concrete work, to S. W. Rittenhouse for about $400,000. Rittenhouse indemnified Bentley against loss or damage directly arising out of his failure faithfully to perform his contract by a surety bond in the penal sum of $100,000, with the Federal Surety Company as surety. Rittenhouse entered upon the performance of his contract on or about March 27, 1923. Some time thereafter, he needed financial aid, and in August, 1923, the Surety Company financed him, and Rittenhouse assigned to it monies due and to become due him thereafter under his subcontract. Under this arrangement, he continued to perform until early in January, 1924, when he was declared in default, and notice of the said default was given to the surety. Following that, on January 10, 1924, the Surety Company undertook the completion of the contract. The work under the subcontract was completed and accepted by the United States as of August 30, 1924. The final estimate due from Bentley to the Surety Company upon the completion of the subcontract was $86,942.90, which is not disputed. The amount covered by this final estimate was retained by Bentley to cover liens and as against damages claimed to be the result of the default of the subcontractor, Rittenhouse, and his successor, the Surety Company.

The principal issue centers about the findings of the master, that the Surety Company was liable in damages for delay in completing the heating system and the water system in accordance with the directions of Bentley. The subcontract provided that all work should be completed on or before July 6, 1924. The heating and water systems

having been installed before that date, it is argued by the Surety Company, subject to a concession hereinafter noted, that this was the only obligation of the subcontractor with respect to time of performance. Section 4 of the contract, however, reads as follows: "Supervision of contract. That the work herein contracted for shall be done under the jurisdiction and control of the contractor, the Quartermaster General of the Army, or such contracting Quartermaster as he may designate."

The Surety Company concedes that by virtue of this provision the subcontractor could not conduct his work with absolute disregard of the progress of other work on the job, but that he was obliged to carry on his work in conformity with the general course of construction. It is claimed, however, that the control provided to be exercised by the contractor was a reasonable control, and not an unreasonable one; that Bentley having directed that the heating and water systems should be made operative for furnishing temporary heat and water during construction by November 21, 1923, and such progress on the subcontract constituting by far the greater portion of the work specified in the subcontract, it was unreasonable to demand that the subcontractor do in seven months substantially the work that under the contract he was permitted to finish within sixteen months. To determine the merits of Bentley's contention, it is necessary to consider other provisions in the contract, and other facts disclosed by the record. Incorporated in the principal contract of Bentley with the government were the War Department's specifications. The subcontract between Bentley and Rittenhouse was entered into with specific reference to such specifications. Paragraph 29, of the specifications, reads as follows: "If he (Bentley) so chooses he may complete the boiler house and its heating equipment and install service mains to the various buildings, and install and operate the heating elements therein, provided he turns them over on completion of the work in a perfect and undamaged condition."

Another provision of the contract required Bentley to keep the buildings sufficiently heated during the progress of the work in the winter season. On September 10, 1923, Bentley wrote to its subcontractor, Rittenhouse, urging upon him the necessity of the completion of the heating system for temporary use. The letter contained, among other things, the following: "It is therefore the understanding that you are to push this portion of the work so as to be completed to such a point as will permit of the boilers, pipes and pipe trench being used in temporary heating this winter."

In addition to this letter, the record shows that Rittenhouse at all times acquiesced in this construction of the contract, and boasted of his ability to perform the work in accordance with Bentley's request. The record further shows that if the work had been begun at the time of the receipt of the September 10th letter it could well have been completed in time to provide temporary heat for the buildings during the winter of 1923–1924, and also that the failure to do so was due not to the unreasonableness of the demand, but to the fact that the subcontractor was incompetent, and did not have sufficient financial ability to carry out the contract. It may be said parenthetically that since the record contains no statement of evidence, either in narrative or any other form, we must assume that all of the findings of fact made by the master and approved by the court are sustained by the evidence, and conclusive upon the parties hereto.

From the facts so found, the trial judge was of the opinion that the construction of the contract as an entirety required that full force and effect be given sections 4 and 29 of the contract, which provided for supervision and direction by the general contractor; that, this provision of the contract having been construed by the parties themselves, such practical construction was entitled to great weight; and that the Surety Company was liable in damages for delay in the performance of its contract in respect to the furnishing of water and temporary heat. We find no error in the holding of the court in this respect.

It is claimed, however, by the Surety Company, that, no specific date having been set in the contract for the completion of any specific item of the work, and no schedule of progress being attached to or referred to therein, the master erred in receiving oral evidence as to facts and circumstances bearing upon the execution of the contract and its later performance, and that the court was wrong in overruling the exceptions to the master's report in that respect. We see no merit in the contention. The Surety Company concedes here, as it did below, that the performance of the contract by the subcontractor was subject to a reasonable control by the principal contractor. It must follow

that, in the absence of any standard of reasonableness being found in the contract, an inquiry into the surrounding facts and circumstances is pertinent, and that the practical construction put upon the contract by the parties themselves should, in the absence of other controlling considerations, prevail, and the case is one where the existence of an ambiguity was so plain that the Surety Company's obligation to perform must have contemplated the solution of the ambiguity by the established rules therefor.

It is further claimed by the Surety Company that, assuming it to be liable for failure to furnish within the time required temporary heat by the use of the permanent heating plant provided for by the contract, certain items of damage allowed by the master, because of injury to plaster, paint and millwork resulting from the unsatisfactory and irregular heat furnished temporarily by means of stoves and salamanders, come under the head of special damage, and that, as its bond made it liable only for any loss or damage directly arising by the reason of the subcontractor's failure to faithfully perform, its exceptions to the allowance of such items of damage should have been sustained. We are unable to say from this record, devoid of any statement of evidence as it is, whether the damages allowed arose directly or indirectly from the subcontractor's failure to perform. We must, therefore, accept the master's findings and the decision of the trial judge upon these items as conclusive.

Exception is taken to the allowance of interest to Bentley upon unliquidated damages. In the recent case of Concordia Insurance Company v. School District, 282 U. S. 545, 51 S. Ct. 275, 278, 75 L. Ed. 528, the Supreme Court, following its own opinion in Miller v. Robertson, 266 U. S. 243, 45 S. Ct. 73, 69 L. Ed. 265, reiterated the rule which it had previously recognized, that "When necessary in order to arrive at fair compensation, the court in the exercise of a sound discretion may include interest or its equivalent as an element of damages." Under this authority, the District Court could, in the absence of an authoritative decision construing a state statute to the contrary in the state court, apply the federal rule. No

such state statute in Ohio is cited, nor any state decision purporting to construe any statute. We assume there is none. We see nothing in the record to warrant the conclusion that the court below, in the allowance of interest, abused its discretion.

The trial judge awarded one-half of the costs below to each of the litigants. This being an equity case, the allowance of costs was within the discretion of the judge, and we are unable to say that in this respect his discretion was abused.

In Bentley's cross-appeal, a number of exceptions are urged to the decree of the trial judge sustaining the findings of the master. In the state of the record already disclosed, it is only necessary to discuss one of them. Interest was allowed on the balance due under the Rittenhouse contract and retained by Bentley at the rate of 6 per cent. per annum, this being the legal rate in Ohio, in the absence of agreement. It is Bentley's contention that the contract, though made in Ohio, was to be performed in Michigan, and that the statutory rate in Michigan of 5 per cent. should have been applied, if any was. Reliance is placed upon Sloss-Sheffield Steel & Iron Company v. Tacony Iron Company (C. C.) 183 F. 645. In that case, a contract to be performed in Alabama was made in Pennsylvania, where suit was brought. It was held that the Alabama rate controlled. We think the prevailing rule is, however, that where interest is not specified in the contract, but is awarded merely as damages for the breach thereof, the rate of interest is to be computed according to the law of the state where the court rendering judgment is located. Mather v. Stokely, 218 F. 764 (C. C. A. 1); Equitable Trust Co. v. Western Pacific Railway Co., 244 F. 485 (D. C. N. Y.); George M. Jones Company v. Canadian National Railway Company, 14 F.(2d) 852 (D. C.), affirmed 27 F.(2d) 240 (C. C. A. 6); Spanton & Co. v. Shipping Company, 279 F. 935 (C. C. A. 5); Eccles & Co. v. Strachan Shipping Co., 21 F.(2d) 656 (D. C. Ga.).

We agree with the conclusions of the trial court on all of the issues raised both by the appeal and cross-appeal, and the decree rendered below is hereby affirmed.