## PRICE et al. v. STONEGA COKE & COAL CO. et al.

No. 3235.

District Court, S. D. West Virginia, at Charleston.

Dec. 19, 1938.

William L. Lee, of Fayetteville, W. Va., and Robert G. Kelly and Edward W. Knight, both of Charleston, W. Va., for plaintiffs.

R. T. Hubard, of Fayetteville, W. Va., Mercer B. Tate, Jr., and E. H. Molthan, both of Philadelphia, Pa., and J. L. Camblos, of Big Stone Gap, Va., for defendants.

McCLINTIC, District Judge.

This suit was brought in the Circuit Court of Fayette County in equity upon an attachment, pursuant to the West Virginia statute in such case made and provided. The controversy involved being wholly between citizens of different states and the amount in controversy exceeding $3,000, exclusive of interest and costs, the suit was removed to this Court by the principal defendant, Stonega Coke and Coal Company, which hereinafter may be referred to as the "defendant" or as "Stonega".

The suit is for the recovery, with interest, of three quarterly installments of $3,000 each of minimum or fixed rent, covering the first three quarters of the year 1932, claimed by plaintiffs as due under three coal leases, together covering about 2,000 acres of land in one boundary in Fayette County, made by some of the plaintiffs and the predecessors in title of the others to one James Laing. Two leases were dated August 1, 1895, and the third (an option subsequently accepted) July 22, 1895. The three leases were assigned by Laing (by an instrument in the form of a lease but technically an assignment and treated as such) to the Sun Coal and Coke Company, by that Company to The New River Collieries Company and by The New River Collieries Company to Stonega. The three leases have been treated by the parties successively interested and considered in the proceedings in this suit as one, and are hereinafter referred to as "the lease".

The lease was modified and supplemented from time to time by subsequent deeds between the parties, among which may be mentioned a deed of February 26, 1906 (Exhibit No. 7 with plaintiffs' bill), extending the period of the lease until all coal in the seam under operation by the lessee should be taken therefrom, a deed dated July 9, 1908 (Exhibit No. 10 with bill), increasing the aggregate of the fixed rents payable under the several instruments constituting the lease to $12,000 per annum, and a deed dated August 24, 1923 (Exhibit No. 17 with bill), but delivered and effective in September, 1923, whereby New River Collieries Company with the consent of the lessors, parties thereto, assigned to Stonega the lease as the same had been modified and supplemented, and was then in effect.

The original leases required the payment of "a fixed money rent", not minimum royalties, for each year of the leases, with the right to mine free coal sufficient at the rate of 8 cents per gross ton of 2240 pounds to equal the fixed rent, and provided a royalty of 8 cents per gross ton on all additional coal mined. The lease was for the period of twenty-one years with provision that if at the termination of the lease all available coal should not have been taken therefrom, then, unless the lessors should elect, as they might, to pay the lessee the value of all improvements other than the branch railroad necessary for the operation of the mine, "the term of this lease shall in that event be extended and continued in force in all respects, and the lessee agrees to continue his mining operations under the provisions of this lease until all the remaining coal is mined and taken from the leased premises".

They also contained a provision, in the proceedings in the suit and hereinafter referred to as the "withdrawal clause", the interpretation of which appears to be the primary and most important question presented in the case. It is as follows: "In case the lessee finds he cannot work this lease at a profit he is to have the right to withdraw from this lease, and remove all improvements placed on the premises if the lessors who shall have have the option to take said improvements or not, elect not to take or pay for said improvements, or any part of same. If lessors elect to take said improvements or any part of same, the value to be paid therefor shall be settled and determined by arbitrators chosen in the manner hereinbefore provided for".

The deed of February 26, 1906, recited that the lessors released their right to terminate the lease at the expiration of twenty-one years and extended and continued "in force the terms of said original leases for the mining of said leased premises until all coal in said premises in said Sewell seam, by which is meant the seam on said leased premises, now being worked by the Sun Coal and Coke Company, shall be taken therefrom".

The deed of July 9, 1908, increasing the aggregate of the annual minimum or fixed rents provided, "But should the coal in said

land become so nearly exhausted by proper mining as to render it impracticable, without fault on its part, to skillfully and properly mine sufficient coal to reimburse said Company as provided in said leases and contract for the minimum or fixed rent hereby agreed on, then and in that event said minimum hereby agreed on shall be thereafter subject to an equitable reduction, so that said Company shall not be required to thereafter pay a greater minimum or fixed rent than it can by energetic, skillful and proper mining reimburse itself for as provided in said leases and contract".

Stonega contended that, having the right under the withdrawal clause to do so, it had withdrawn from the lease and terminated its obligations thereunder on December 1, 1931; that the coal in the leased premises had become so nearly exhausted as to render it impracticable for it to skillfully and properly mine sufficient coal to reimburse it for any part of the minimum or fixed royalties provided in the deed of July 9, 1908; and that by a deed dated April 15, 1932 (Exhibit No. 1 with Stonega's answer), between the plaintiffs and The New River Collieries Company, in the proceedings and hereinafter referred to as the "release", releasing The New River Collieries Company and Stonega from liability for any failure of The New River Collieries Company or its predecessors in title to comply with, or for any violation of the terms, conditions and provisions of the lease prior to the assignment thereof to Stonega, Stonega was released from its obligation to discharge and perform the duties and obligations of the lessee under the lease from and after the assignment to it.

The plaintiffs contended that the withdrawal clause gave an option or right to the lessee to withdraw from the lease when he should have reached and proven the coal (which was susceptible of operation only by a slope of considerable length or by a shaft about 100 feet deep) if he should then find that he could not profitably work the same, but that right must be exercised, if at all, when he had sufficiently determined the character of the coal to enable him to make a finding whether he could profitably operate it or not, and was not a right coterminous with the lease; that the right of withdrawal lapsed when the lessee on reaching and proving the coal found that he could profitably operate it and proceeded to do so; that in any event the right of withdrawal if still existing was surrendered when the leases were extended by the deed of February 26, 1906; that the clause providing for the reduction of the fixed or minimum rent contained in the deed of July 9, 1908, increasing the fixed or minimum rent has no application to the facts in the case; that more than 4,000,000 tons of coal remain in the leased premises and the lease is, and will continue, in effect until such coal has been mined; that if Stonega had been entitled to withdraw from and terminate its obligations under the lease on December 1, 1931, it had not done so, having continued in possession of the leased premises by numerous tenants until after the institution of this suit; and that the release of April 15, 1932, released Stonega only from its obligation as surety of The New River Collieries Company on the liability of the latter for damages due to improper mining prior to the assignment of the lease to Stonega, and did not release any obligation of Stonega as lessee under the lease arising or accruing after such assignment.

The case was referred to Frank Lively, Esquire, as Special Master to make a report for the advice and assistance of the Court. Special Master Lively filed his report on the 17th day of May, 1938. Exceptions to the report were filed, one by the plaintiffs and one hundred and eighty-three by Stonega, and the case has been heard by the Court upon the report of the Special Master and the exceptions thereto. Counsel on each side in briefs and orally argued the case broadly, and no point arising upon any exception was specifically presented. The Court is of opinion to and doth overrule all and singular the exceptions and approve and adopt the report of the Special Master, but deems it proper to supplement the same as follows:

The land demised, afterwards known and frequently referred to as the "Sun property", was in a part of the New River coal field which had been developed by the construction of the Loup Creek Branch of the Chesapeake and Ohio Railway only about one year before the making of the lease, and the coal—the Sewell seam—which it was proposed to mine under the lease nowhere outcropped on the leased land or near the same. Where it was developed by a slope and a shaft on a tributary of Loup Creek the coal was about 100 feet below the surface and deeper elsewhere on the property.

Development of the property required a short railroad built by lessee from the Loup Creek Branch of the C. & O. Railway. In

July–August, 1895, the mines which had been opened on that branch were few in number and new, only partially developed and too remote from the leased land to give reliable indications of the coal to be expected in the leased land. The Sewell seam of coal could not be prospected by surface openings on the leased lands, Laing did not undertake to prospect the same by core drilling and so far as was known no one had ever prospected it.

Rumors were prevalent that the Sewell coal on Loup Creek was not as good as that in mines which had been operated on New River. There were no shaft or deep slope mines in West Virginia, except perhaps one mine in the northern panhandle, and there was a prejudice against shaft mining on the part of miners, who preferred to work in drift mines. It was anticipated that "troubles or litigation" might delay the construction of the railroad from the proposed mine to the Loup Creek Branch of the C. & O., and the lease provided that its term of twenty-one years should be extended and the beginning of rental payments postponed by the time lost by such delay, not exceeding five years. The withdrawal clause was inserted in the lease at the instance of lessee Laing, but there is no evidence that the construction thereof was discussed, or that any construction which either party may have placed thereon was communicated to the other.

Laing had associates in his proposed enterprise and they incorporated the Sun Coal and Coke Company, to which Laing assigned the lease in 1897. The coal was reached in the slope in 1897, and was found of good thickness and quality. Whereupon Laing and the Sun Coal and Coke Company developed a mine, known as the "Sun Mine", which proved to be one of the most profitable mines in the New River field and was at one time the largest coal producer therein. The coal produced was of high quality, low in volatile matter and high in fixed carbon and belonged to the class of so-called "smokeless coals".

In 1906, after the mine had been under operation for about nine years Laing and his associates transferred the stock of the Sun Coal and Coke Company to The New River Collieries Company, which through the Sun Coal and Coke Company until the later assignment of the lease to it, and thereafter directly, operated the mine until the assignment to Stonega in 1923.

Stonega, which appears to be a large organization with mines and interests elsewhere than in West Virginia, took an assignment of the lease and the property on the leased premises, along with another lease, or other leases, and other property in West Virginia in 1923, allocating for accounting purposes to the Sun property about $1,000,000 of the purchase money paid for the combined properties. Before the purchase it caused to be made a comprehensive and thorough examination of the Sun mine extending over a period of several months by an adequate corps under the direction of its Vice President Taggart and its Chief Engineer Rogers. Its representatives knew when the purchase was made the disadvantages as well as the advantages of the property, including the handicaps which in this suit are complained of as tending to prevent profitable operation. Its representatives did not know the precise extent of an area of dirty coal found in the northwest portion of the property, but they had warning from indications in the Sun mine itself and from core drilling previously done on adjoining property, to the results of which they had access, that dirty coal might be expected there.

Vice President Taggart made a written report, excerpts from which are in the record, advising that the mine be brought to a production of 30,000 tons per month, and estimating an expenditure of $200,000 to $250,000 as necessary to bring the mine and its equipment into satisfactory condition. He also reported that if smokeless coal should continue to bring on an average the price then prevailing of $3.60 per net ton of 2,000 pounds the investment in the Sun mine should be a profitable one.

Stonega took over the Sun mine in September, 1923, proceeded to improve its condition and equipment and successfully operate it, though at no time did it have the benefit of an average price of $3.60 per net ton for the coal produced. In the few months of 1923 after the assignment and in the year 1924 Stonega's returns from its operations were less than its operating expenses, but in 1925 and succeeding years to and including the depression year of 1930 its cash receipts exceeded its cash operating expenses by an average of about $87,000 per year, and an aggregate of $521,499.87.

1931 was the second year of the depression and all coal producers suffered, the to-

tal returns on all coal sold being considerably less than the total cost of production. In the eleven months of 1931 during which Stonega operated it sustained a heavy cash loss, due wholly, as the Special Master has found, to the great depression in the coal business. There was no excessive mining cost at the Sun mine in 1931, and its operating expenses per ton compared favorably with those of preceding years. And while the output was substantially less than in any other year of Stonega's operations except the year 1924, the production in the eleven months of 1931 was 308,590 net tons, yielding tonnage royalties of $22,285.-11, as against the fixed or minimum rent for the year of $12,000.

On November 17, 1931, Stonega mailed to the plaintiffs notice of its intention to withdraw from the lease on December 1, 1931, claiming the right so to do under the withdrawal clause and giving no other ground for withdrawal, on or before December 1 discontinued mining operations, thereafter proceeded to remove and dispose of such equipment and plant as it desired to remove, and finally abandoned the premises in April, 1932. The mine at the time of the hearing before the Special Master had filled with water. Before dismantling the mine Stonega in writing called on the plaintiffs to make their election whether under the withdrawal clause they would take over the plant and equipment, but the plaintiffs in writing declined to make any election under the withdrawal clause and notified Stonega that they would undertake to hold it to its obligations under the lease.

There were a large number of dwelling houses upon the Sun property. When Stonega discontinued its operations 175 of these houses were occupied by tenants under written leases from Stonega. Stonega executed assignments of these 175 leases to the plaintiffs, procured the consent to such assignments of its tenants and tendered the same to the plaintiffs, who refused to accept them. Of these 175 tenants more than 100 remained in the houses on the leased premises at the time when the hearings before the Special Master began.

No corporate authority by action of the Board of Directors for withdrawing from or surrendering the lease is shown.

The record contains much expert testimony as to conditions in the mine when Stonega discontinued operations, most of which in the view the Court takes of the case is irrelevant. But the Court is of opinion, as was the Special Master, that the weight of such evidence is with the plaintiffs and that the Sun mine was on December 1, 1931, as good as the average mine in the New River field, and capable of profitable operation when the average New River mine could be so operated.

The minable coal in the Sun mine was far from exhausted. Stonega's witnesses admitted that more than 1,700,000 gross tons of minable coal remain therein, and the Court is of opinion that the Special Master was conservative in his finding that the tonnage remaining is at least 2,300,000 tons. Much of the coal claimed before the Master as unminable was of the same character as Stonega had been successfully mining and selling for years, was mining at the time of its notice of withdrawal and was planning to continue mining, as shown on a mine map submitted to the plaintiffs about December 1, 1931, by symbols used by engineers to show intended operations and how they would be conducted.

The Special Master's finding that the undertaking to withdraw from the lease was hurriedly determined by some of Stonega's officers is warranted. The action was without corporate sanction, was inconsistent with Stonega's claims in its suit against the Sugar Creek Coal Company begun in August, 1931, of the minable coal remaining in, and the value of, the Sun property and inconsistent with the mine map which Stonega submitted to plaintiffs on December 1, 1931, after it had given its notice of withdrawal, which showed as unminable only a comparatively small part of the territory later claimed as such, and indicated an intention to continue mining operations except in the relatively small area shown as unminable. And plaintiffs were pressing for a settlement of their claims against New River Collieries Company, in respect of which Stonega was surety.

When the suit was brought three quarterly installments of $3,000 each, of the fixed rent covering the first three quarters of the year 1932, had become due under the terms of the lease and were unpaid.

Considering first the interpretation of the withdrawal clause, the clause is ambiguous, a conclusion which is strengthened when the conditions and circumstances surrounding, and existing at the time of, the making of the lease are considered, as they may be. It gives a right to the lessee to terminate his obligations under the lease contingent upon his find-

ing that he cannot profitably work the same. The exercise of the right depends upon the determination of a question of fact and, the clause neither prescribing a time limit within which the determination must be made nor providing that it may be made at any time during the 21 years of the term of the lease, the question of when this determination may be made and the important right contingent thereon exercised unavoidably presents itself.

When surrounding facts and circumstances, summarized in the Special Master's report and hereinbefore, are considered, the reasons for inserting the withdrawal clause in the lease and the failure to prescribe a time limit therein are apparent. The property had not been prospected and could not be except by core drilling, it was in a newly opened field and the few mines which had been opened were so new and at such distance as not to afford reliable information. The lease bound the lessee to pay a fixed money rent for the term thereof whether he should mine any coal or not. It was therefore only reasonable to give the lessee an opportunity to get the proof of the coal, which ordinarily would have been gotten by previous prospecting. And the facts, including the fact that the lease contemplated that the lessee might be delayed in his work as long as five years by troubles or litigation affecting his railroad, forbade fixing a limited time within which the lessee. must determine whether he could profitably operate the property.

It is the contention of Stonega that the right of the lessee to withdraw from and terminate his obligations under the lease might be exercised at any time he should find operation thereunder unprofitable, even thirty-six years from the date of the lease and more than thirty years after the original lessee had found that he could operate the property profitably, had proceeded to do so, and had developed a large mine, which had been profitably operated for many years. The Special Master was, and the Court is, unable to agree with this contention.

■ If the withdrawal clause had given an unconditional option doubtless it would have prescribed the time within which it might be exercised, whether limited or coterminous with the lease. But the option was a conditional one, contingent upon the determination of a question of fact.

That it was impracticable to fix a time limit for that determination is plain. But it does not follow that such determination, or a declaration thereof, and the exercise of the right dependant thereon, might be indefinitely postponed at the pleasure or for the convenience of the lessee. To recognize a right to such postponement would practically convert the contingent option into an unconditional one coterminous with the lease, if as Stonega contends, a few months—a period short as compared with the 36 years expired of the term of the lease and the remainder thereof as measured by the minable coal remaining—of unprofitable operation under extraordinary market conditions would justify a conclusion that the lessee could "not work this lease at a profit". It is a matter of common knowledge that the coal industry has its years and periods of unprofitable, as well as profitable, operation.

■ Rather will it be held that the determination, upon which the contingent option rests, must be made as soon as it is reasonably and fairly practicable to do so. Every pertinent rule for the interpretation of contracts demands such holding. The conditions existing and circumstances attending the making of a contract must always be considered in interpreting any doubtful provisions, Raleigh Lumber Co. v. Wilson & Son, 69 W.Va. 598, 603, 72 S.E. 651; Bragg v. Lumber Co., 102 W.Va. 587, 135 S.E. 841; Knotts v. Bartlett, 83 W.Va. 525, 98 S.E. 590; Massachusetts Bonding Co. v. Bridge Co., 4 Cir., 37 F.2d 695; Federal Surety Co. v. Bentley & Sons Co., 6 Cir., 51 F.2d 24, 78 A.L.R. 1041; White v. Sayers, 101 Va. 821, 823, 45 S.E. 747; Cowan v. Radford Iron Co., 83 Va. 547, 551, 3 S.E. 120; every intendment is in favor of a reasonable, fair and equitable construction of a contract and against a harsh construction, or one that might operate as a snare, Carper v. Gas Co., 78 W.Va. 433, 442, 89 S.E. 12, L.R.A1917A, 171; Cowan v. Iron Co., supra; United States v. Skinner & Eddy Corp., D.C., 28 F.2d 373; White v. Sayers, supra; Brooks & Co. v. Public Service Co., 4 Cir., 37 F.2d 220; where a contract is made for the accomplishment of one main purpose every provision must be read in the light of such provision, Carnegie Natural Gas Co. v. Oil Co., 56 W.Va. 402, 49 S.E. 548; Wetterwold v. Woodall, 83 W.Va. 647, 98 S.E. 890; contracts optional in respect of one party are

strictly construed against him, Williston on Contracts, Sec. 620; Martin v. Consolidated Coal & Oil Corp., 101 W.Va. 721, 133 S.E. 626; construction of a particular provision will be against the party at whose instance it was inserted, Charlton v. Chevrolet Motor Co., 115 W.Va. 25, 174 S.E. 570; Epes' Adm'r v. Hardaway, 135 Va. 80, 115 S.E. 712; Centrosoyus-America Co. v. U. S., D.C., 30 F.2d 302; Calderon v. Atlas etc. Co., 170 U.S. 272, 18 S.Ct. 588, 42 L.Ed. 1033; American Surety Co. v. Pauly, 170 U.S. 133, 18 S.Ct. 552, 42 L.Ed. 977; agreements or options indefinite as to time require performance or acceptance within a reasonable time, McClung v. Railway Co., 110 W.Va. 621, 159 S.E. 521; Huminsky v. Nat. Bank, 107 W.Va. 658, 150 S.E. 9; White v. Sayers, supra; Banque Russo–Asiatique v. Dolch, 9 Cir., 3 F.2d 266; Holt v. Trust Co., 4 Cir., 52 F.2d 1068.

The withdrawal clause on its face affords an answer to the question when the lessee must determine whether he could profitably operate the lease and according to his finding either exercise or lose the right to withdraw. The phrase "withdraw from" rather than "terminate", "cancel", or "rescind" is unusual, and may be regarded as indicating a tentative or experimental occupation. But regardless of phraseology, only if the answer should be in the negative to the question whether the lessee could profitably operate the lease would the lessee be entitled to withdraw. And it is logical, as well as just and equitable, that the lessee be required to exercise the right of withdrawal or lose the same when he had sufficient information to enable him to determine whether he could profitably operate the property or not.

This conclusion is strengthened by resort to the existing and surrounding conditions and circumstances. Because there had been no prospecting of the property by Laing or anyone else his request that he should have the right to withdraw from the lease if he should find that he could not operate the same profitably was only reasonable. No business man with a proposition as unproven as the Sun property then presented would be willing to assume the obligation to pay a fixed rent under a lease for twenty-one years, or contemplate the expenditure of the large sums necessary to fully develop a property of 2,000 acres, without a reasonable oppor-

tunity to prove to his satisfaction whether the land contained workable coal. But it would be wholly unreasonable for a lessee to ask, and inconceivable that a lessor in possession of his senses would grant, the right to surrender before its termination a lease of property still containing millions of tons of minable coal after many years of profitable operation, whenever the lessee should come to the conclusion that under conditions then existing he could not operate profitably.

The main purpose of the lease was the "energetic, approved and skillful" development and operation of a coal mine upon the property leased until all the coal therein should be mined and removed, unless the lessors should exercise their option to take over the property at the end of 21 years. The withdrawal clause gives an option to the lessee and was inserted at the instance of the lessee for which reasons it must be construed strictly against the lessee. And the case clearly calls for the application of the rule that an agreement indefinite as to time must be construed to require performance of a duty or exercise of a right within a reasonable time, and for holding that 36 years is far beyond such reasonable time. Accordingly, it is concluded that the lessee's right to withdraw under the withdrawal clause could have been exercised only if, when the lessee had reached and proven the coal, it was his judgment—his finding—that he could not operate the lease profitably, and that when on reaching and proving the coal he found that he could operate the lease profitably and proceeded to develop and profitably operate a large mine on the property, the right to withdraw ended.

If there could be doubt about the interpretation of the withdrawal clause it is the conclusion of the Court, as it was the Special Master's, that the deed of February 26, 1906, surrendering the lessor's right to terminate the lease, and extending the same until all the coal in the Sewell seam in the leased land should be mined and removed therefrom, surrendered any right under the withdrawal clause. A large and profitable mine had been successfully operated upon the property for six or eight years, and it is not conceivable that the parties understood that a right dependent upon finding that the property could not be profitably operated had continued after it had been conclusively proven

that it could be ·profitably operated, or that they intended that such right should be continued when the lessee was paying a substantial consideration to be freed from the risk that the lease would be terminated at the end of 21 years and assured of its continuance until all the coal in the Sewell seam should be mined and removed.

In the Court's view of the case it is not material whether some of Stonega's officers had in good faith found before giving the notice of withdrawal that Stonega could not profitably work the lease and whether such finding was justified by the facts. But the hurried nature of the action, as shown by the absence of any preliminary warning to or discussion of the matter with the landlords, the short notice given, the failure to submit a question of such importance to the Board of Directors, which alone could authorize a surrender of the lease, the inconsistencies between the declaration of the intention to withdraw and Stonega's attitude in its suit against the Sugar Creek Coal and Coke Company and the showing of the map submitted to the landlords on or about December 1, 1931, the existence of disputes between the landlords and The New River Collieries Company and Stonega at the time, and Vice President Taggart's admitted anticipation that plaintiffs "might open negotiations" upon the giving of the notice, if not evidencing bad faith, as charged by the plaintiffs, do not indicate thorough and careful consideration of an action comparable in importance with the taking over of the property. And if the question were material the Court would hold that if certain officers of Stonega in fact found that Stonega could not profitably work the lease the finding was not justified by the facts. Stonega, after it had improved the condition of the property and beginning with the year 1925 had substantial, in some years large, cash earnings in every year except 1930 and 1931, both years of great commercial and industrial depression throughout the country. And the small cash gain in 1930 and the loss in 1931 were due wholly to the greatly depressed market prices. The mine in November, 1931, was an average New River mine, in good condition, its operating expenses were normal, and its production in 1931 had been at the rate of a little more than 28,000 net tons per month. Stonega's losses because of the condition of the coal market in 1931 would not justify a conclusion that it could not operate the Sun mine profitably.

Although Stonega by its notice of intention to withdraw from the lease based its claimed right so to do only on the claim that it could not profitably work the lease, and did not claim that the minable coal in the leased land was exhausted or near exhaustion, in its answer it quotes the provision of the deed of July 9, 1908, hereinbefore quoted, giving to lessee the right to an equitable reduction of the increased minimum or fixed rent agreed on by that deed when the coal should become so nearly exhausted as to render it impracticable for the lessee to skillfully and properly mine sufficient coal to reimburse it for the minimum or fixed rent, and avers that the coal in the leased premises had become so nearly exhausted as to render it impracticable for the defendant to skillfully and properly mine sufficient coal to reimburse it for any part of the minimum or fixed royalties.

■ Plainly, the quoted clause provides for an equitable reduction of the fixed or minimum rent when it should be impracticable to annually mine coal in such amount that the aggregate tonnage royalties thereon should equal the annual fixed or minimum rent of $12,000, and has no application so long as the lessee by skillful and proper mining can produce 150,000 gross tons per year, the tonnage necessary to yield at 8 cents per ton royalties equal to $12,000. That the coal in the Sun mine had not become so nearly exhausted as to justify any reduction of the fixed or minimum rent is proven by the fact that in the eleven months of 1931 Stonega mined coal at a rate sufficient to yield in twelve months more than $24,000 in tonnage royalties.

Stonega has also vigorously contended that the coal in the Sun mine in November, 1931, was "practically exhausted" and the lease therefore terminated when it gave notice of its intention to withdraw. This contention was not advanced until after the litigation began. Practical exhaustion of the mine and the consequent termination of the lease was not given as a reason for withdrawal in the notice thereof, which on the contrary recognized the lease as in effect subject to the right claimed by Stonega under the withdrawal clause.

Stonega did not sustain this contention. Its officers and agents had made a protracted and thorough examination of the Sun mine in 1923 before taking over the property and assuming all obligations of the lessee thereafter to arise or accrue, including the obligation to pay the fixed or minimum rent and the taxes upon the property until all the coal remaining in the Sewell seam therein should be mined and removed. It had complete information of the then condition of the mine, and in its subsequent operations it encountered nothing that was not known to its representatives at the beginning thereof except the exact amount of dirty coal in the northwest portion of the mine, and it had full warning and reason to expect dirty coal in that territory.

According to the weight of the evidence the Sun mine in November, 1931, was as good as the average mine in the New River field and susceptible of profitable operation when the average mine could be profitably operated, it contained at least 2,300,000 tons of minable coal, and had a productive capacity in excess of 30,000 tons per month, which was Mr. Taggart's aim in the report made of the examination of the mine before Stonega took it over.

While impurities had been found in the coal in the northwest portion of the mine, it was minable with the exception of a relatively small area, much of it had been mined, the product had been merchantable, and the remaining coal was of substantially the same character and quality as that which Stonega had mined and sold in previous years. A large part of the area claimed on the hearing by some of Stonega's witnesses as unminable consisted of the barriers of coal left for the protection of the "roof" between "rooms" which had previously been mined, and the product thereof shipped and sold. A considerable part of these barriers or "pillars" had been mined and shipped, and the map submitted to the landlords on or about December 1, 1931, showed an intention to continue the work then under way in them.

The working conditions in the mine and the condition of its equipment appear to have been substantially the same as in previous years after it had been rehabilitated by Stonega, as evidenced by the fact that the mining cost in 1931 was not excessive as compared with the pre-vious years of Stonega's operations, or any of them. The only disappointment that Stonega suffered or cause for disappointment it encountered was the behavior of the market.

█ It is well settled that courts will not entertain a lessee's plea of practical exhaustion of coal, so long as coal remains in substantial quantity and of the quality known and to be expected at the date of the lease, and will hold lessee to the performance of his contract, even though mining may have become unprofitable due to fallen prices, and even though those prices may never again rise to former or profitable figures. The lessee takes the risk of the market. Williams Pocahontas Coal Co. v. Berwind & Co., 4 Cir., 76 F.2d 319; Rocky Mountain Fuel Co. v. Albion & Co., 10 Cir., 70 F.2d 212; Laurence E. Tierney Land Co. v. Kingston-Pocahontas Coal Co., 241 Ky. 101, 43 S.W.2d 517, 521; Hall v. Eversole's Adm'r, 251 Ky. 296, 64 S.W. 2d 891, 897; Atwater & Co. v. Fall River Collieries Co., W.Va., 195 S.E. 99.

█ It is likewise well settled that where, as here, the presence of minable coal in leased premises was known at the date of the lease, though the amount thereof was not known and could not be exactly ascertained, the lessee will be held to his contract and compelled to pay a fixed rent until the termination of the lease, though mining might become unprofitable, and even though the coal might be entirely exhausted. Lawson v. Williamson Coal & Coke Co., 61 W.Va. 669, 57 S.E. 258; National Coal Co. v. Overholt, 81 W.Va. 427, 94 S.E. 735; Lehigh & Wilkes-Barre Coal Co. v. Wright, 177 Pa. 387, 35 A. 919; Lehigh Valley Coal Co. v. Everhart, 206 Pa. 118, 55 A. 864.

█ This Court and the Fourth Circuit Court of Appeals have held that where a lessee has made an examination of the property before making his lease, and has agreed to pay a fixed rent or minimum royalty for a term of years, he will be held to the strict performance of his contract, even though subsequent and more thorough or more expert exploration may have shown that the mineral which lessee intended to operate was non-existent. Moxham v. Sherwood Co., 4 Cir., 267 F. 781.

█ It is therefore concluded that the coal in the Sun mine was not "practically exhausted" and the lease therefore ter-

minated on December 1, 1931, and on the contrary that the coal was far from exhausted, more than 2,300,000 minable tons remaining, and that under the terms of the lease it is in effect and binding upon Stonega until its termination by the mining and removal of the remaining coal.

If Stonega had had a right on December 1, 1931, to withdraw from the lease and terminate its obligations thereunder, it did not effectively do so. When it discontinued operations it left in dwelling houses upon the leased premises its tenants which it had placed therein under written leases to the number of about 175, of whom 100 or more at the time the hearings began before the Special Master were still occupying the houses in which Stonega had placed them. The possession of these tenants was possession by Stonega (Taylor v. Thomas, 106 W.Va. 376, 378, 145 S.E. 633), and Stonega could not surrender possession of the leased premises and terminate its obligation to pay rent and taxes, however complete its right to do so might have been, so long as the landlords refused to accept a surrender and Stonega remained in possession of the leased premises or any part thereof. Taylor v. Thomas, supra; Lennox v. Vandalia Coal Co., 158 Mo. 473, 59 S.W. 242; Saylor v. Howard, 229 Ky. 826, 18 S.W.2d 279; Gambill's Adm'r v. Coal Co., 230 Ky. 553, 20 S.W.2d 286; Lewis v. Miller, 141 Misc. 138, 250 N.Y.S. 24.

Finally, Stonega has contended that if it had not the right to withdraw from and terminate its obligations under the lease on December 1, 1931, or did not effectively withdraw, the plaintiffs by the deed of April 15, 1932, released and discharged it from all the obligations as lessee under the lease, which it assumed when it became a party to the deed of August 24, 1923, assigning the lease to it. This contention is not tenable.

Under the assignment to it Stonega assumed two distinct obligations. The first was an assumption of liability to the plaintiffs by reason of improper mining which might have been done by The New River Collieries Company or any of its predecessors in title prior to the transfer of the lease affected by the said deed. This obligation was that of a surety, since The New River Collieries Company was not released from its primary liability. The second obligation was to assume each and every of the duties and obligations of the lessee under the lease which might arise or accrue subsequent to the date of delivery of the assignment, and do and perform all things required of the lessee by the lease, especially the payment promptly as they became due of all rents and royalties. And The New River Collieries Company was released from any further obligation or liability under the lease arising subsequent to the date of the delivery of the assignment.

By the deed of April 15, 1932, the plaintiffs released both The New River Collieries Company and Stonega from liability on account of any failure of The New River Collieries Company or its predecessors in interest or title to comply with, or for any violation of, the terms, conditions and provisions of the lease. The release expressly provided that nothing therein contained should be construed to release the Stonega Company from its obligations, which it had assumed as lessee by the deed of assignment from and after the date of delivery of the assignment.

The obligations of Stonega under the deed of assignment were separate and independent. One was as surety to guarantee the payment by The New River Collieries Company of whatever sum might ultimately be found due from it on account of bad mining prior to the transfer of the lease to Stonega. The other was, taking the property in the condition in which it then was in September, 1923, and which Stonega's officers and representatives well knew from an exhaustive examination thereof, to operate the same and perform and discharge all the duties and obligations of the lessee under the lease until all the minable coal in the Sewell seam in the property should be mined and removed. And the effect of the release was to release The New River Collieries Company and Stonega as its surety from liability for bad mining done prior to the transfer of the lease to Stonega. It could have had no other or further effect and did not in any way affect Stonega's obligations as lessee.

It follows from the foregoing that the Court is of opinion, and doth find, that the lease is, and will continue, in effect until Stonega shall have mined and removed the minable coal remaining in the Sun mine; that Stonega had not the right under the withdrawal clause, or upon any other ground, to withdraw from or ter-

minate its obligations under the lease on December 1, 1931; that Stonega must carry out its contract and perform and discharge the duties and obligations as lessee which it assumed by the deed of assignment of August 24, 1923, including the payment in quarterly installments of the fixed rent of $12,000 per annum and the taxes upon the demised premises, until it shall have mined and removed the minable coal remaining in the Sewell seam in the demised premises; and that the plaintiffs are entitled to recover from Stonega the sum of $3,000 with interest from the 1st day of May, 1932, the further sum of $3,000 with interest from the 1st day of August, 1932, and the further sum of $3,000 with interest from the 1st day of November, 1932, according to the prayer of their bill, with costs. And a decree will be entered accordingly.